[No. 25808-7-I.   Division One.   February 24, 1992.]

RAYMOND R. HURLBERT, ET AL, *Respondents*, v. JOSEPH H. GORDON, ET AL, *Appellants*.

*Jeffrey D. Laveson, Bruce Winchell, Wilbur Lawrence,* and *Lane Powell Spears Lubersky,* for appellants.

*Michael D. Helgren, Robert M. Sulkin,* and *Culp, Guterson & Grader,* for respondents.

KENNEDY, J. — This is an action for negligence in the execution of professional duties. Appellants, the law part-

nership of Gordon, Thomas, Honeywell, Malanca, Peterson & O'Hern and the respective marital estates of the individual partners (collectively referred to as Gordon Thomas), appeal the trial court's grant of partial summary judgment to respondents and the court's denial of their motion for summary judgment dismissing the claims of respondents. Because we determine as a matter of law that Gordon Thomas did not breach its duty to the respondents, we reverse the trial court's judgments and remand for entry of judgment in favor of appellants. We also impose a monetary sanction upon respondents' attorneys for egregious violation of RAP 10.3 in the preparation of their brief for this appeal.

## FACTS

In 1978, the plaintiffs/respondents Raymond R. Hurlbert, Stephen R. Hammer and Wesley James Hammer, the successors in interest to Gateway Lumber, Inc. (collectively referred to as Gateway), formed Gateway Lumber, Inc., to own and operate a sawmill on leased land in Snohomish County. Later, Gateway offered the sawmill for sale and reached an oral agreement with Brazier Forest Products (Brazier) to sell its sawmill assets to Brazier for $1 million. The purchase price was to be paid partly with cash and the remainder by a secured promissory note. After Gateway stated it had no one to prepare the agreement of sale, Brazier offered to have its attorney handle the document preparation and Gateway agreed to this. Gordon Thomas was retained by Brazier to draft the agreement, and William Holt was the attorney who actually consulted with Brazier and who drafted the agreement.

On June 5, 1981, John Brazier (the sole owner of Brazier), Lyle Bare (Brazier's chief financial officer), the owners of Gateway and their bookkeeper Marlene Bennett[1] met in Ms. Bennett's office to execute the agreement of sale (the Agree-

---

[1] Ms. Bennett is variously referred to as Gateway's bookkeeper and its accountant. Since Gateway's principals refer to her as Gateway's bookkeeper, that title will be used.

ment) which had been prepared by Holt. The purchaser and seller reviewed and signed the Agreement on that day. The Agreement stated that the assets were to be purchased with $70,000 by way of down payment and a promissory note for $930,000 at 10 percent interest. The promissory note was to be secured by a "WBA-1A" security agreement on the equipment being purchased. Specifically, the Agreement stated that:

> [a]t closing, Purchaser shall deliver to closing agent, a check payable to the closing agent in the amount required for the down payment and an executed Promissory Note, Security Agreement (on Form WBA-1A) and executed UCC Financing Statements on the equipment being purchased.

In trial testimony, both Stephen Hammer and Hurlbert stated that, at the time they signed the Agreement, they believed that this clause gave them a security interest only on the equipment which they were selling to Brazier.

The Agreement did not specify Holt's firm or Holt as the escrow/closing agent, although Holt later assumed that duty. Brazier was instructed by Gateway to prepare and forward closing documents to Ms. Bennett and otherwise to deal directly with Ms. Bennett, who was authorized by Gateway to retain an attorney to review the closing documents. This instruction was passed on by Brazier to Holt.

Ms. Bennett's only explicit instructions from Gateway were to make sure that the deal contained "no loopholes" and to ensure that the deal would provide Gateway with a working sawmill should the Agreement be breached.

Holt, as attorney for Brazier, consulted with Brazier concerning the form of the closing documents. Pursuant to the wishes of Brazier, Holt modified the standard WBA-1A security agreement by "x"ing out the "substitution clause" — that portion of the preprinted form which gave a security interest in all "improvements" or "increases" to the collateral property. Although the effect of the deletion was disputed by experts at trial, one expert witness testified that the effect of this deletion was to remove any security interest in after-acquired property.

In mid-July 1981, Holt sent drafts of the proposed closing documents to Bennett for her review. In his accompanying cover letter to her, Holt made specific comments that the previously existing ITT industrial credit guaranty, the Olympic Bank guaranty and the Olympic Bank security agreement would have to be modified so as not to impair any security which Brazier would need in order to get loans for mill improvements.[2] Holt made no mention in the cover letter of the change in the WBA-1A form between Gateway and Brazier. In the same letter, however, Holt also stated that it was his understanding "that you will have Gateway's attorney review and approve these documents."

After reviewing the proposed closing documents, including the altered security agreement, Bennett sent the papers on to Vern Seather, the attorney she had retained on behalf of Gateway. In her letter to Seather dated July 20, 1981, a copy of which was sent to Gateway, Bennett noted that there were changes to the standard forms, and she expressed her general concern that the security interest in the equipment would not be sufficient to protect Gateway in the event of a default.

After reading a copy of Bennett's letter to Seather, Hurlbert, one of Gateway's principals, contacted Bennett, wanting to make sure that Gateway was adequately protected in the event of a default. Shortly thereafter, on July 24, 1981, in response to the concern expressed in her letter to him, Seather wrote to Bennett, stating with respect to the collateral that since paragraph 7 of the standard security agreement form prohibited the removal of collateral without Gateway's permission, the collateral should be sufficient.[3]

---

[2] ITT and Olympic Bank already had security interests in some of Gateway's equipment that was to be sold to Brazier as part of the deal. In order to avoid any problems with granting future security interests on the equipment, Brazier told ITT and Olympic Bank of the purchase and negotiated new security agreements with them.

[3] In fact, paragraph 7 of the document which was sent to Bennett and Seather only prohibited the unilateral removal of the collateral from the state of Washington. There was no limitation on removing the collateral from the mill.

On July 29, 1981, Bennett called Holt and told him that Gateway's attorney had approved the closing documents which Holt had sent to her. The transaction closed on August 18, 1981, at Gordon Thomas' Tacoma office. Jim Hammer and Stephen Hammer were the only principals representing Gateway at the closing. Stephen Hammer reviewed and signed the closing instructions prepared by Holt and also acknowledged in writing that Holt had represented Brazier in the preparation of "certain documents" and that Gateway had had an opportunity to review the closing documents with legal counsel.

The Hammers then signed the closing documents, including the modified security agreement. When presenting the WBA-1A security agreement for the Hammers' signatures, Holt pointed out a change in paragraph 7 of the document, which change had been made after Bennett's and Seather's review, but he did not point out the change he had made in the substitution clause, *i.e.*, the change which already had been sent to Bennett and approved by Seather.

In December 1981, in the course of remodeling the mill, Brazier began to remove some of the equipment it had purchased from Gateway. Stephen Hammer, who still worked at the mill, became concerned about the removal of these assets. With the assistance of another worker at the mill, Hammer began removing equipment from the mill to use at another mill that his family was constructing.

In November 1983, Gateway sued Brazier, alleging that Brazier had impaired Gateway's collateral securing the note, by removing the collateral from the Arlington mill. Brazier then counterclaimed for theft of some of the collateral by the Hammers. While that suit was pending, Brazier ceased to operate the mill and filed for bankruptcy, at a time when it still owed Gateway $802,644 on the promissory note. Brazier stipulated that the bankruptcy filing constituted a default of Brazier's obligations to Gateway. Gateway received $325,000 in the bankruptcy proceedings, in the form of a secured note which paid 12 percent per annum.

Thereafter, a trial was held on Brazier's counterclaim for theft, and Brazier received a judgment against the Hammers for $113,000.

In 1984, Gateway filed suit against Seather, Bennett and Gordon Thomas, claiming damages for professional negligence. Gateway claimed that but for this negligence, it would have received a security interest in after-acquired property at the mill. Gateway settled with Seather for $300,000 and with Bennett for $155,000.

Gordon Thomas first moved for partial summary judgment on the issue of liability with respect to the alteration of paragraph 7 of the security agreement (this paragraph governed Brazier's ability to remove equipment from the mill), which was granted.[4] Gordon Thomas then moved for summary judgment based upon its claim that as a matter of law it did not breach any duty owed to Gateway. This motion was denied. Later, Gateway moved for partial summary judgment on the issue of breach of duty, and, finding as a matter of law that Holt breached his duty to disclose the change to the substitution clause directly to Gateway at the closing, the trial court granted partial summary judgment to Gateway on this issue.

The issues of proximate cause and damages then went to trial. The jury returned a verdict of $1,374,000 against Gordon Thomas. The trial court then modified the verdict, subtracting from the verdict amount the moneys received by Gateway from Bennett and Seather and the money collected by Gateway from Brazier in the bankruptcy proceedings. Judgment was entered on May 3, 1990, in the amount of $743,194. This appeal followed.

## DISCUSSION

Appellants challenge the trial court's denial of their motion for summary judgment and its entry of partial summary judgment in favor of respondents on the issue of breach of duty.[5]

---

[4]This ruling has not been appealed by respondents.

[5]Appellants also raise numerous other issues on appeal. Because we determine that the trial court erred as a matter of law by granting summary judg-

■ In determining whether an order of summary judgment is correct, this court is to engage in the same inquiry as the trial court. *Rhea v. Grandview Sch. Dist. JT 116-200*, 39 Wn. App. 557, 559, 694 P.2d 666 (1985). A motion for summary judgment should be granted if there is no genuine issue of material fact or if reasonable minds could reach only one conclusion on that issue, based upon the evidence presented, construed in a light most favorable to the nonmoving party. *Sea-Pac Co. v. United Food & Comm'l Workers Local Union 44*, 103 Wn.2d 800, 802, 699 P.2d 217 (1985).

In the present case, the material facts are not disputed. All parties acknowledge that Holt acted as the escrow/closing agent for both parties and, that as escrow/closing agent, he had a duty to act impartially with respect to both parties. All parties further agree that because Holt was acting as the attorney for Brazier in the preparation of the closing documents, he had a duty to disclose this representation to Gateway and to inform Gateway of any changes to the standard form WBA-1A, which form had been agreed upon by the parties in the agreement of sale. The parties differ, however, with respect to what constitutes adequate notice regarding the change to the substitution clause in the preprinted standard form.

■ Appellant contends that sending the document showing the proposed deletion of the substitution clause for review and approval by Gateway's bookkeeper and attorney was sufficient disclosure of the change, as a matter of law. Respondents contend, and the trial court held as a matter of law, that an attorney acting as an escrow agent is required to go over the closing documents "paragraph by paragraph" at the time of the closing, and to ensure that the parties understand the documents at closing. As a question of law, this court is to examine the issue de novo. *Parker Roofing Co. v. Pacific First Fed. Sav. Bank*, 59 Wn. App. 151, 156, 796 P.2d 732 (1990).

---

ment to Gateway and by failing to enter summary judgment in favor of Gordon Thomas on the issue of breach of duty, we need not address appellants' other assignments of error.

Washington case law does not specifically set out what is required for an "adequate disclosure" of information in a situation such as this. In making its determination, the trial court apparently relied on the deposition testimony of Hawkins, an expert in residential real estate transactions, who stated that he thought a paragraph-by-paragraph review was required, although he could not point to specific case law which supported that requirement. We disagree with this conclusion.

This state's Supreme Court had cause to examine the duty of an attorney acting as an escrow agent in the case of *Bowers v. Transamerica Title Ins. Co.*, 100 Wn.2d 581, 675 P.2d 193 (1983). In that case, the court stated that:

> In addition to the duty to follow the escrow instructions . . . an attorney escrow agent must also meet the standards of the legal profession, including those standards set forth in the Code of Professional Responsibility.

*Bowers*, 100 Wn.2d at 588. Although that case did not address the method by which an attorney acting as an escrow agent is to disclose changes to a document, the court noted that the standards of the legal profession prohibit an attorney from representing parties with opposing interests unless that attorney can adequately represent the interests of each and unless each consents to the representation after full disclosure of the effect of such representation. *Bowers*, at 589; *see also* RPC 1.7.

Because the potential for adversity of interest exists in every closing of a real estate or commercial transaction, and because an attorney's duty while acting as an escrow agent requires him to exercise strict impartiality between the parties, such attorney has a duty to inform the parties to the closing of the advisability of obtaining independent legal counsel. *Bowers*, at 590. Here, however, it is undisputed that Gateway already had availed itself of the services of independent legal counsel. It is also undisputed that Gateway agreed that Brazier's attorney would draft the documents to accomplish the transaction, subject to review and approval of the documents by an attorney to be retained by Bennett on behalf of Gateway.

Gateway argues that attorney Holt breached a duty owed to Gateway by consulting unilaterally with Brazier, and by obtaining Brazier's approval of the deletion of the substitution clause in the security agreement before ever forwarding the proposed drafts to Bennett. Gateway also contends that Holt breached his duty to Gateway by failing to disclose *all* the changes to form WBA-1A at the closing. The evidence does not support these conclusions. As to the unilateral consultation with Brazier before the closing, there is no evidence in this case that Holt was retained to represent both Brazier and Gateway *as an attorney*. The undisputed evidence is to the contrary. It was not until the closing that Holt assumed the function of and therefore the obligations of an escrow agent.[6] Furthermore, although an escrow agent has a duty to disclose *all* changes in the closing documents, we also find that Holt did not breach that duty.

Contrary to respondents' contention and the trial court's holding, Holt's duty as escrow agent did not require him to discuss the documents and the nature of the changes "paragraph by paragraph" at the closing. This is so for two reasons: one, Holt had already disclosed the deletion of the substitution clause by sending the documents to Bennett and Seather for their review; and two, such a paragraph-by-paragraph "explanation" of the nature of the changes would

---

[6]It is not an unusual practice in commercial transactions for an attorney for one of the parties to assume the escrow duties for both parties. This case differed from the norm in at least two respects: first, Holt did not deal directly with attorney Seather, rather he dealt through Bennett. However, this was at the express direction of Gateway. Second, Holt made a subsequent change to the security agreement without the knowledge and approval of Seather. Although Holt made the change to paragraph 7 known to Gateway's representatives at the closing, which was appropriate in his role as escrow agent, in his role as Brazier's attorney, he should have first disclosed the change to Seather. If it were material to any issue involved in this appeal, this might change our result concerning the adequacy of Holt's disclosure. We reject respondent's contention that the change in paragraph 7 raises a question of fact concerning the change in the substitution clause of the WBA-1A form. That issue has already been ruled upon by the trial court and has not been appealed. The change in paragraph 7 is distinct from and not interrelated with the deletion of the substitution clause.

have violated RPC 4.2, which prevents Holt from intruding into Gateway's relationship with its own attorney.[7]

■ Under general theories of agency, notice given to and knowledge acquired by an agent is imputed to the principal as a matter of law. *Pilling v. Eastern & Pac. Enters. Trust,* 41 Wn. App. 158, 163, 702 P.2d 1232, *review denied,* 104 Wn.2d 1014 (1985).

■ In the present case, adequate disclosure of the deletion of the substitution clause was made to Gateway's agents. Holt forwarded the changed document to Bennett and understood that it was in turn forwarded to Seather and approved by him. The practice of forwarding drafts of proposed documents in order that they may be reviewed by opposing parties or attorneys, as Holt did in this case, is widespread and routinely used to provide "notice" that changes to a document are desired by a party. Where all parties are represented by counsel, such drafts are exchanged among the attorneys. It would not have been permissible for Holt to deal directly with Gateway in these negotiations, because Holt knew Bennett had been instructed to retain an attorney to represent Gateway with respect to the closing documents. So long as the proposed change was clearly visible, as it was here, it was justifiable for Holt to assume that the document would be examined and the change noted by Gateway's attorney.[8] If Gateway's

---

[7]Respondent's contention that the trial court did not impose a duty of legal interpretation is dispelled by examining the oral ruling of summary judgment wherein the court stated that the escrow agent has a duty to explain the "nature" of any changes to the document.

[8]Merely the "pro forma" sending of documents to an attorney may not constitute disclosure of changes to a document if there is reason to believe that the changes will not be seen. But in this case, there was no indication to Holt that the proposed change had not been seen by the attorney for Gateway. There is no factual dispute that it was communicated to Holt that Gateway's attorney reviewed and approved the document. Bennett told Holt that Seather had reviewed and approved the document, and Gateway's representative signed a release document indicating that the closing documents had been examined by Gateway's attorney and that Gateway's principals understood that Holt was an agent of the purchaser.

Respondent has not raised a question here as to the conspicuousness of the change to the security agreement or as to the understandability of the release

attorney failed to take note of the significance of a clearly visible change in a proposed document, that was a breach of his duty, but not of Holt's duty.[9]

Respondents have not argued, nor can it be seriously contended that Ms. Bennett and in turn Seather were not authorized agents of Gateway. As agents, their knowledge is imputed to Gateway, and therefore adequate disclosure of the proposed deletion of the substitution clause from the WBA-1A form was given by Holt to Gateway. *See Pilling*, at 163. Once Holt was informed that Gateway's attorney had approved the documents, he was entitled to conclude that Gateway was aware of the deletion and approved the

document that Gateway's representatives signed acknowledging its attorney's examination of the documents. *See Conradt v. Four Star Promotions, Inc.*, 45 Wn. App. 847, 849-50, 728 P.2d 617 (1986). The release document was a simple 2-page document which Holt had Gateway's representatives read. Nor is there evidence that Holt should not have considered Bennett or Seather competent enough to examine the proposed change and to disclose it to and discuss it with their client. The evidence is undisputed that Bennett did in fact notice that there were changes to the standard forms and that she expressed concern to Seather that the security interest in the equipment might not be sufficient to protect Gateway in the event of a default.

[9]Contrary to respondents' contentions in their brief, such reasoning is not a use of one agent's liability as a defense of another agent's liability. See Brief of Respondents, at 37-50. Clearly, the fact that Gateway's attorney or bookkeeper may have acted negligently or without actual knowledge of changes in the documents does not exculpate any negligence or change any duty on the part of appellants. However, neither should any negligence on the part of Gateway's agents cause Holt's actions to be considered negligent as a matter of law.

Again, respondents' reasoning is flawed because they assume that Holt's failure to personally discuss changes in the closing documents with Gateway's principals was "wrongdoing" which Holt attempts to shield by pointing out the negligence of Gateway's attorney. See Brief of Respondents, at 38. However, as noted above, there is no wrongdoing if adequate disclosure only requires that proposed changes be disclosed conspicuously in a draft sent to a principal's agent and attorney. Therefore, there is no "breach of trust or care" which appellants are attempting to shield with the "fact that the injuries were caused by two agents or two sets of agents." See Brief of Respondents, at 38 (quoting *Oxford Shipping Co. v. New Hampshire Trading Corp.*, 697 F.2d 1, 7 (1st Cir. 1982)). Furthermore, the scope of Gateway's agents' authority is not at issue here. Thus, Gateway cannot contend that Holt unequivocally knew he could not use the bookkeeper or attorney as agent. *See Pilling v. Eastern & Pac. Enters. Trust, supra* at 163.

change. Disclosure to Gateway beyond this simply was not required.

■ Moreover, it would have been a violation of the Rules of Professional Conduct for Holt to have discussed and "explained" the change in the security agreement to Gateway's representatives in the manner suggested by Gateway.

> In representing a client, a lawyer shall not communicate about the subject of the representation with a party the lawyer knows to be represented by another lawyer in the matter, unless the lawyer has the consent of the other lawyer or is authorized by law to do so.

RPC 4.2; *see also National Bank of Wash. v. Equity Investors*, 81 Wn.2d 886, 912, 506 P.2d 20 (1973); *see also Bowers*, 100 Wn.2d at 588 (an attorney escrow agent must also meet the standards of the legal profession).

It is permissible for the attorney for one of the parties to a business transaction to act as the escrow/closing agent, so long as all parties to the transaction consent to that, and so long as the attorney so acting can do so within the requirements of the Rules of Professional Conduct, but it is not permissible for such an attorney to offer legal advice to another party to the transaction whose interests he or she does not represent. If such other party has been represented by independent legal counsel, it is to his or her own attorney that he or she must look for advice as to the meaning of the documents that he or she is to sign. If the other party has not been represented, the attorney serving as closing agent (in addition to disclosing his or her representation of his or her own client) may only suggest that such party consult with independent legal counsel before signing. *Bowers*, 100 Wn.2d at 588-89.

In addition to the ethical prohibitions against offering legal advice to a nonclient, such a requirement would place an impossible burden on escrow agents. As strikingly demonstrated in this case, the effect of language in closing documents may be subject to more than one interpretation. This is why every party should have his or her own attorney and why *Bowers* requires an agent to advise the parties

that they may seek independent legal advice rather than requiring an escrow agent to dispense such advice himself or herself.

That Gateway has suffered a loss does not mean that Holt breached his duty. A party's primary protection in a commercial transaction comes from its own attorney, not the attorney for the other party or the escrow agent. Thus, in this case although Gateway may have suffered a loss because Gateway's agents breached their duty, under the facts here presented we find no breach of duty by Gordon Thomas.

We hold as a matter of law that Holt's preclosing disclosure to Gateway's agents of the deletion of the substitution clause from the WBA-1A standard form was adequate, and that once Holt was informed that Gateway's attorney had approved the documents there was no additional duty to again disclose the deletion directly to Gateway at the time of the closing. A determination that Gordon Thomas did not breach its duty to Gateway, a necessary element of Gateway's claim, requires dismissal of the case. Therefore, we reverse the trial court's judgment and remand for entry of judgment in favor of Gordon Thomas.

## SANCTIONS

RAP 10.3(a)(4), (5) and RAP 10.3(b) require that reference to the relevant parts of the record must be included for each factual statement contained in the sections of the parties' briefs devoted to the statement of the case and to argument. RAP 10.4(f) provides that references to the record should designate the page and part of the record which supports each factual statement contained in the statement of the case and in the argument.

Although not explicitly stated in RAP 10.3(a)(5), it is implicit in the rule that the citations to legal authority contained in the argument in support of a party's position on appeal should relate to the issues presented for review and should support the proposition for which such authority is cited.

The purpose of these rules is to enable the court and opposing counsel efficiently and expeditiously to review the accuracy of the factual statements made in the briefs and efficiently and expeditiously to review the relevant legal authority.

The record for this appeal was massive, consisting in all of some 6,000 pages of Clerk's Papers, exhibits and verbatim reports of proceedings. Numerous assignments of error were raised. Although the dispositive issue on appeal was of such a nature that the court was not required to address in the decision all of the assignments of error, it was nevertheless necessary for the court and for opposing counsel to track numerous factual statements through the massive record and to review all of the legal authority cited, as to all issues on appeal.

Gateway's attorneys provided this court with a 95-page respondents' brief, special leave having been granted for a lengthy brief because of the number and complexity of the issues on appeal. By Gateway's attorneys' count, there were 413 references made to the record and 187 citations of legal authority. Gateway's brief contained numerous references to Clerk's Papers which were either nonexistent, or difficult if not impossible to find, because of typographical errors in the references. On several occasions the pages cited were irrelevant to the factual statements for which the references were made. Several references were made to 20- or 50- or 100-page documents rather than to specific pages of the record relating to the particular factual statements made.

Virtually all of the factual statements made in the argument section of the brief were made without reference to the record, in direct violation of RAP 10.3(a)(5) (which is incorporated by reference into RAP 10.3(b)), making it necessary to refer back to the statement of facts, many pages earlier in the brief, in order to track (or to attempt to track) the factual statements back to the record. Finally, in several instances case citations contained typographical

errors and in numerous other instances cases were cited which did not support the positions for which they were cited.

█ Pursuant to RAP 10.7, we impose $750 in sanctions upon respondents' attorneys for this appeal, payable to the registry of this court. This type of "laissez-faire" legal briefing falls far below the high standards of professionalism of the firm in question and we do not expect such errors will be repeated. Nevertheless, in this instance, the briefing errors wasted the time of opposing counsel and hampered the work of the court. Accordingly, the violations of the rules will not go unnoticed and unsanctioned.

BAKER and AGID, JJ., concur.

After modification, further reconsideration denied March 27, 1992.

Review denied at 119 Wn.2d 1015 (1992).