

IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| DANIEL VARGAS, | ) | |
| | ) | No. 35093-2-III |
| Appellant, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| CITY OF ASOTIN, | ) | UNPUBLISHED OPINION |
| | ) | |
| Respondent. | ) | |

FEARING, J. — Daniel Vargas sues his former employer, the city of Asotin, for wrongful discharge from employment in violation of public policy. He appeals from summary judgment dismissal of his cause of action. We affirm the dismissal because of a lack of evidence that any reporting by Vargas of wrongful conduct of the city police chief caused his discharge.

FACTS

Since we address the City of Asotin's summary judgment motion, we view the facts in the light most favorable to Daniel Vargas. Vargas started his career as a law enforcement officer in California in 2000. In California, he served as a deputy for the Contra Costa County's Sheriff's Office.

On January 4, 2012, Daniel Vargas assumed a position as a police officer with the city of Asotin. Vargas worked as one of two officers along with Asotin Police Chief William Derbonne. During the opening months of Vargas' tenure, the two officers maintained an amicable relationship.

Later Chief William Derbonne's and Daniel Vargas' relationship deteriorated when Vargas concluded that Derbonne exploited his position of power with the city of Asotin to Derbonne's personal benefit. In a declaration filed in response to a summary judgment motion, Vargas averred:

> I knew that he [Derbonne] was operating an illegal gun business from the police department, using City of Asotin funds to transport, ship, and deliver fire arms from his personal business. I knew that he had a gun license that was registered to the City of Asotin attorney, listed as a store front. I knew that William Derbonne was using his fire arms dealer license to purchase items for the City of Asotin while receiving "Kick Backs" from the vendors he purchased items from.
> I knew that he was killing wildlife during the night . . . . I knew that the way the evidence room was run was illegal, as was the way the Department collected evidence. There was no chain of custody involved, which possibly allowed innocent individuals to be found guilty.

Clerk's Papers (CP) at 127-28. According to Vargas, Derbonne also shot a wild

2

Canadian goose and ordered Vargas to dispose of the fowl.

Daniel Vargas testified that he conveyed Chief William Derbonne's illicit acts to four separate authorities. Vargas claimed he reported Derbonne to the city of Asotin's staff for killing the goose, to the FBI for failing to implement evidence protocols, to the Bureau of Alcohol, Tobacco, Firearms and Explosives for commingling his personal gun enterprise with his duties as Asotin Police Chief, and to the Washington State Patrol for a fight at City Hall. He does not identify the staff member or members of Asotin to whom he reported Derbonne.

Daniel Vargas claims that William Derbonne knew that Vargas had complained to a higher authority and, consequently, acted paranoid. Bill Guinn, an officer in training at the time, noticed Vargas and Derbonne's relationship sour. In a declaration, Guinn testified:

> Sometime around April 2013, things got extremely bad between [Vargas] and [Derbonne]. [Derbonne] spent a lot of time talking to me about [Vargas] and how [Vargas] was reporting him for things like illegally killing a goose, illegally selling guns from the city vehicles and property and other things such as the evidence room. [Derbonne] also told me he knew that [Vargas] had gone to a council member and reported him and that he had also gone to the mayor for the same reason. [Derbonne] would regularly tell me he knew [Vargas] was reporting him and trying to get him in trouble. He made no attempt to hide how troubled he was with this.

CP at 92.

Bill Guinn noted that William Derbonne remarked to Guinn on a previous occasion that either himself, meaning Derbonne, or Daniel Vargas needed "to go." CP at

3

92. Guinn also recalled riding in an automobile with Derbonne when Derbonne ordered Guinn to repeat aloud whatever rumors Guinn had heard Vargas spread about Derbonne. Guinn felt Derbonne exerted pressure on him to file a negative report about Vargas.

On March 26, 2013, William Derbonne arrived at Asotin City Hall and demanded to speak with City Councilman Anthony Rogers. Councilman Rogers and his wife met Derbonne in the main entryway to City Hall. After Councilman Rogers entered the foyer, Derbonne locked the City Hall doors, which action caused Rogers concern. Derbonne interrogated Rogers and his wife regarding whether either had spoken to Daniel Vargas recently. Derbonne momentarily positioned his hand on his pistol in a threatening manner while standing in front of the doorway. A nervous Councilman Rogers told Derbonne: "get the [f]uck out of the [o]ffice." CP at 82. Derbonne then called Asotin Mayor Vikki Bonfield to determine if she was present in her office. Rogers overheard a voice on the phone say that Mayor Bonfield was in her office, and, as a result, Derbonne left. Councilman Rogers and Chief Derbonne have not communicated since. Vargas witnessed no portion of the altercation at City Hall.

The day after the confrontation between Councilman Anthony Rogers and Chief William Derbonne, Rogers called Daniel Vargas and asked Vargas how to garner a protection order. Vargas reported the confrontation to the Asotin County Sheriff's Office and the Washington State Patrol.

Deana Portluck, a deputy city clerk for Asotin, testified that she noticed Chief

4

William Derbonne conducting gun sales on city property. Portluck overheard Derbonne tell an unidentified individual that he shot a goose and Daniel Vargas disposed of the carcass. Portluck retold one of her interactions with Derbonne:

> I tried to walk into the office and the door was locked. I knocked and [Derbonne] let me in and I realized that [Derbonne] and Ellen Boatman, another city employee, were having a conversation about [Vargas]. I asked [Derbonne] what was wrong and [Derbonne] said that [Vargas] needed to stop bad mouthing him, and I told [Derbonne] that [Vargas] wasn't badmouthing him, that he seemed upset, had asked me what I thought he should do and that I'd told [Vargas] to talk to the mayor about the goose. [Derbonne] kept saying that [Vargas] "needs to go" before he starts telling everybody, and that he'd heard through the grapevine that [Vargas] already had. [Derbonne] stormed out.

CP at 99.

According to William Derbonne, Daniel Vargas uttered disparaging comments toward Derbonne while employed by the city of Asotin. Derbonne "orally counseled" Vargas on multiple occasions for "'trash-talking.'" CP at 47. Derbonne concluded that Vargas' comments and behavior denigrated the image of the Asotin Police Department and created unnecessary friction between Asotin's only two police officers. Derbonne lacked knowledge of any complaints about him sent by Vargas to the Bureau of Alcohol, Tobacco, Firearms, and Explosives, the Federal Bureau of Investigation, and the Washington State Patrol.

On March 29, 2013, William Derbonne and Mayor Vikki Bonfield met with Daniel Vargas to discuss a recent complaint from Bill Guinn of Vargas' ongoing "trash

5

talking," incidents of insubordination, and Vargas' failure to complete required reports. Derbonne did not seek to terminate Vargas' employment before the meeting. At the beginning of the meeting, Chief Derbonne tendered to Vargas a personnel action form. The personnel action form served notice to Vargas of his unacceptable professional behavior and a warning of insubordinate behavior. Vargas refused to accept the form and became irate. He asked to be placed on administrative leave.

During the March 29 meeting, Daniel Vargas acknowledged to Derbonne and Mayor Bonfield that he "trash talked" and that he had no intention of stopping. Tensions between Vargas and Derbonne peaked during the meeting, and Mayor Bonfield asked Vargas how to resolve the conflict. Vargas replied that he would only communicate with Derbonne via e-mail.

In his declaration, Daniel Vargas avowed that Chief William Derbonne's behavior at City Hall prompted Vargas' combative behavior, during the March 29 meeting with Mayor Vikki Bonfield and Chief Derbonne:

> I knew that William Derbonne locked employees inside City Hall, being armed and under the color of authority, and engaged in a verbal argument during which at one point he put his hand on his Department-issued firearm.

CP at 128. Vargas left the March 29 meeting with an understanding that he had been placed on paid administrative leave.

Daniel Vargas counseled with an attorney, who then mailed Asotin Mayor Vikki

Bonfield a letter to inquire of when Vargas' administrative leave would end. On April 8, 2013, Mayor Bonfield sent Vargas a letter that informed him that he had been terminated from employment because Vargas expressed an unwillingness to discuss resolution to the discord with Chief William Derbonne.

In a declaration, Mayor Vikki Bonfield testified about her decision to terminate Daniel Vargas from employment after the March 29 meeting:

> Prior to this meeting, Chief Derbonne never mentioned terminating Mr. Vargas's employment to me, nor did I consider that to be a conceivable option. . . .
> . . . .
> . . . Termination of employment was not the course of action that either the Chief or I preferred; however, I had every reason to believe that Mr. Vargas would continue to engage in the undesirable insubordination and negative commentary (Mr. Vargas admitted that he trash talks all the time "that is me"), and also understood that Mr. Vargas refused to communicate with his only fellow police officer only via email. Under these circumstances, I concluded that in the interests of public safety and the efficiency of the police department, I had no alternative other than termination of Mr. Vargas's employment.
> . . . At no time prior to my meeting with Mr. Vargas was I aware that he had made a formal complaint to any outside agency. Further, as I had no knowledge of these complaints until after Mr. Vargas's employment was terminated, I could not and did not advise Chief Derbonne of any of these alleged complaints. Finally, as I had no knowledge of these complaints until after Mr. Vargas's employment was terminated, they played no part whatsoever in my decision to terminate his employment.

CP at 33-34.

Officer Bill Guinn testified in his declaration:

> There is no doubt whatsoever in my mind why [William Derbonne] fired [Vargas]. He did so to try and stop [Vargas] from getting him in

trouble or ruining the good thing [Derbonne] had going.

CP at 92. Councilman Anthony Rogers swore in his declaration:

> It does not surprise me that the mayor, Vicki Bonfield, wouldn't ask too many questions if [William Derbonne] wanted to fire [Vargas]. I do not know why, but she seemed to do everything he told her to do and give him anything he asked for. Those two were very close.

CP at 97.

## PROCEDURE

On November 27, 2013, Daniel Vargas filed a complaint alleging wrongful discharge against the City of Asotin. Vargas claims Mayor Vikki Bonfield terminated him because Vargas reported the illegal behavior of William Derbonne.

The City of Asotin deposed Daniel Vargas on December 2, 2014. The city's counsel repeatedly questioned Vargas regarding evidence of any knowledge that Mayor Vikki Bonfield or Chief William Derbonne learned of any reports he forwarded about Derbonne's conduct to third parties. Vargas admitted he could not identify any evidence showing Mayor Bonfield's knowledge of any of the reports. The following colloquy occurred between Asotin's counsel and Vargas during the deposition:

> Q. Let me rephrase it a little bit. As you sit here today, can you tell me, beyond your presumption, whether Mr. Derbonne was aware you had that conversation with Ms. Bonfield about the gun sales?
> A. I have no evidence, no, sir.
> Q. As you sit here today, do you know whether Chief Derbonne was aware of your contact with the Spokane office of the ATF about his gun sales?
> A. Yes, sir.

8

Q. All right. And how do you know he was aware of that?

A. She.  The agent, she told me that she would be contacting him, and that maybe he just didn't understand the paperwork.

Q. All right. So, Ms. Young told you she would be contacting -

A. Uh-huh.

Q. — Mr. Derbonne?

A. Yes, sir.

Q. All right.  In what conversation was that?

A. It was in conversation number two.

Q. Do you know if she ever contacted Mr. -

A. Evidence-wise? No, not evidence-wise.  Presumptive-wise?  Yes.

Q. As you sit here today, do you know whether Mr. Derbonne ever became aware that you had these conversations with the FBI?

A. Again, you're going to ask for evidence. No, I have no solid evidence.  Did he?  Absolutely.

Q. And when you say he absolutely did, that's based upon your presumption?

A. I guarantee you the ATF agent contacted him and advised him or gave him a hint on who reported, absolutely.

Q. What I need to know is whether you can point me to any evidence that establishes that the FBI agent had that conversation with Mr. Derbonne, or whether you're just assuming that happened.

A. When we finish the deposition later, I will provide with you that evidence.  Because I am more than certain.

Q. But right now—

A. Right now, no, sir.

Q. So, let me make sure my record's clear.

A. Yes, sir.

Q. As you sit here today, you can't say—Strike that.

As you sit here today, you can't point me to any evidence that establishes that Mr. Derbonne was aware prior to April 5th, 2013, that you had had these conversations with the FBI?

A. I have no evidence for you today, no.

Q. All right.

A. I was told by him that he received complaints, and so he was going to slow things down.  And that's how I knew that she had made contact with him.

Q. All right. Mr. Derbonne told you that he had received complaints?

A. Yes, sir.

Q. And did he tell you from whom he received those complaints?

A. He said — No. He didn't provide me any names.

Q. Did he — Well, tell me what you recall him saying.

A. That was just it. And he did. He stopped selling guns from his patrol car for a while. I'd say a couple months. You know, maybe three months. He slowed it completely down.

And the reasoning behind that was that, so I knew she had talked to him at that point.

. . . .

Q. All right. Do you recall anything else he said, other than he had received —

A. No.

Q. — complaints from the ATF, and that as a result, he was going to slow down his sales?

A. No, sir.

. . . .

As you sit here today, can you point me to any evidence that you believe establishes that [William] Derbonne was aware of your phone call to Deputy Snyder prior to your termination [regarding a complaint to the Washington State Patrol]?

A. I'm not sure who talked to [William] Derbonne. [William] Derbonne knew that I reported it the day I received a phone call. But that's going to be through deposition of Dan Hally and everybody else. He knew.

. . . .

Q. All right. As you sit here today, can you point me to any evidence that you believe establishes that [William] Derbonne was aware prior to April 5th, 2013, that you had made phone calls to the Washington State Patrol regarding the City Hall incident?

A. No, sir.

CP at 61-70.

For each report that Daniel Vargas claimed to have forwarded to a regulatory body

about Chief William Derbonne, Asotin's counsel questioned Vargas, during the

10

deposition, with similar questions. Vargas repeatedly responded that he could not identify any evidence showing Mayor Vikki Bonfield knew of his reports of misconduct.

The City of Asotin filed a summary judgment motion to dismiss Daniel Vargas' complaint in December 2016, more than three years after the filing of the complaint. In response to the City of Asotin's summary judgment motion, Vargas forwarded no percipient evidence of Mayor Bonfield's knowledge of any report he forwarded. The trial court granted Asotin's motion.

LAW AND ANALYSIS

Under familiar principles, this court reviews an order for summary judgment de novo. *Keck v. Collins*, 184 Wn.2d 358, 370, 357 P.3d 1080 (2015). We must determine whether "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Parkin v. Colocousis*, 53 Wn. App. 649, 653, 769 P.2d 326 (1989) (quoting CR 56(c)). Summary judgment is appropriate "if reasonable minds could reach only one conclusion on that issue, based upon the evidence presented, construed in a light most favorable to the non-moving party." *Hurlbert v. Gordon*, 64 Wn. App. 386, 393, 824 P.2d 1238 (1992).

An adverse party may not rest on mere allegations or denials of a pleading, but a response must identify specific facts showing a genuine issue for trial. CR 56(e). The nonmoving party may not rely on speculation, argumentative assertions, or in having its

11

affidavits considered at face value.  *Seven Gables Corp. v. MGM/UA Entm't Co.*, 106

Wn.2d 1, 13, 721 P.2d 1 (1986).

Daniel Vargas asserts the common law tort of wrongful discharge in violation of

public policy against his former employer, the city of Asotin.  Vargas claims the city

retaliated against him by terminating him from employment for reporting the misconduct

of Chief William Derbonne.

Washington has adopted a four-part test that a plaintiff must prove in order to

impose liability on his or her employer: (1) the existence of a clear public policy (the

clarity element), (2) that discouraging the conduct in which the plaintiff engaged would

jeopardize the public policy (the jeopardy element), (3) that the public policy linked

conduct caused the dismissal (the causation element), and (4) that the defendant has not

offered an overriding justification for termination of the plaintiff (the absence of

justification element).  *Anica v. Wal-Mart Stores, Inc.*, 120 Wn. App. 481, 495, 84 P.3d

1231 (2004); *Gardner v. Loomis Armored, Inc.*, 128 Wn.2d 931, 941, 913 P.2d 377

(1996).  The City of Asotin relies on both the causation and overriding justification

elements.  We resolve the appeal only on causation.

The public policy exception to the tort of wrongful discharge is narrow, such that

the employee holds the burden of proving the dismissal violates a clear mandate of public

policy.  *Rickman v. Premera Blue Cross*, 184 Wn.2d 300, 309, 358 P.3d 1153 (2015);

*Thompson v. St. Regis Paper Co.*, 102 Wn.2d 219, 232, 685 P.2d 1081 (1984).  Because

the exception is narrow, courts must apply it cautiously to avoid allowing the exception to swallow the general rule that employment is terminable at will. *Sedlacek v. Hillis*, 145 Wn.2d 379, 390, 36 P.3d 1014 (2001); *Anica v. Wal-Mart Stores, Inc.*, 120 Wn. App. at 495 (2004).

The employee must establish specific and material facts to support each element of his prima facie case. *Hiatt v. Walker Chevrolet Co.*, 120 Wn.2d 57, 66, 837 P.2d 618 (1992). If the plaintiff fails to establish each element of his or her prima facie case, the defendant is entitled to judgment as a matter of law. *Fulton v. Department of Social & Health Services*, 169 Wn. App. 137, 148, 279 P.3d 500 (2012).

A necessary element to establish a cause of action for retaliation is the employer's knowledge of the employee's reporting. *See Anica v. Wal-Mart Stores, Inc.*, 120 Wn. App. 481. In recognition of the difficulty of proving motive, the employee may show knowledge by circumstantial evidence, since the employer is not apt to announce retaliation as his motive. *Wilmot v. Kaiser Aluminum and Chemical Corp.*, 118 Wn.2d 46, 69, 821 P.2d 18 (1991). Daniel Vargas presents some evidence that Chief William Derbonne knew of Vargas' complaints to third parties of Derbonne's conduct. Nevertheless, Vargas fails to provide any evidence showing Mayor Vikki Bonfield had knowledge, circumstantial or direct, of complaints that Vargas filed regarding William Derbonne. The undisputed evidence shows that Vikki Bonfield rendered the decision to

13

fire Vargas. Therefore, since Vargas fails to establish the causation element required to make a prima facie case, summary judgment was appropriate.

In her declaration, Mayor Vikki Bonfield denied any knowledge of Daniel Vargas' reporting of misconduct of Chief William Derbonne. Mayor Bonfield insisted that she fired Vargas because of his unwillingness to discuss solutions with William Derbonne. The City of Asotin questioned Daniel Vargas repeatedly during his deposition about what evidence or facts he might possess to prove that Bonfield knew of reports made by Vargas prior to Vargas' termination from employment. Vargas had no evidence to show such a nexus.

Daniel Vargas contends the hostile behavior between Councilman Anthony Rogers and William Derbonne at City Hall on March 26 confirms that Derbonne told Mayor Vikki Bonfield about Vargas' complaints. We disagree. A host of other reasons could explain the March 26 confrontation. Rogers does not testify that he told Bonfield of any allegations asserted by Vargas about Derbonne's misbehavior. The testimony may establish that Derbonne and Mayor Bonfield conversed behind a closed door, but we have no admissible evidence of the content of the conversation. We cannot base a decision on speculation as to the content.

We decline to join our dissenting sister in applying subordinate bias liability because Daniel Vargas did not assert this theory of liability before the superior court and does not forward this theory before this reviewing court. Generally, issues not raised in

14

the trial court may not be raised for the first time on appeal. RAP 2.5(a); *State v. Nitsch*, 100 Wn. App. 512, 519, 997 P.2d 1000 (2000). Also, we deem an issue not briefed on appeal to be waived. *Kadoranian v. Bellingham Police Department*, 119 Wn.2d 178, 191, 829 P.2d 1061 (1992); *Hall v. Feigenbaum*, 178 Wn. App. 811, 817, 319 P.3d 61 (2014). We also should not base a ruling on a new theory without affording the City of Asotin the opportunity to brief and address the theory. RAP 12.1(b).

The Washington Supreme Court has never adopted subordinate bias liability. We also find no decision that applies subordinate bias liability to a wrongful discharge in violation of a public policy claim. Nevertheless, most other jurisdictions have adopted this basis for liability in military, union advocacy, gender, and racial discrimination cases, and this court has reasonably and expertly adopted the theory in some of such settings. *Boyd v. State*, 187 Wn. App. 1, 349 P.3d 864 (2015); *City of Vancouver v. Public Employment Relations Commission*, 180 Wn. App. 333, 325 P.3d 213 (2014). We assume our high court will follow in various settings, including in cases asserting the tort of wrongful discharge in violation of public policy. Still, we question the viability of subordinate bias liability under the undisputed facts on review.

In subordinate bias liability cases, a biased subordinate, who lacks decision making power, uses the formal decisionmaker as a dupe in a deliberate scheme to trigger a discriminatory employment action. *City of Vancouver v. Public Employment Relations Commission*, 180 Wn. App. at 351. Subordinate bias liability recognizes that the biased

15

subordinate does not personally "pull the trigger" on the adverse employment decision, but the subordinate's animus sets in motion the events that culminate in the adverse employment action. *City of Vancouver v. Public Employment Relations Commission*, 180 Wn. App. at 351. Because the employer has delegated some authority in the subordinate over the employee, which authority may influence employment decisions, the employer may be held liable if the subordinate's bias leads to an adverse employment decision regardless if the decisionmaker lacks the prohibited animus. *City of Vancouver v. Public Employment Relations Commission*, 180 Wn. App. at 351.

Subordinate bias liability does not hold the employer automatically liable if a subordinate with supervisory authority holds a bias against the employee. *City of Vancouver v. Public Employment Relations Commission*, 180 Wn. App. at 354-56. If a recommendation of the subordinate has little effect on the employer's decision or if the employer reaches an independent decision, the subordinate's animus did not cause the adverse employment decision. *City of Vancouver v. Public Employment Relations Commission*, 180 Wn. App. at 354. The employee bears the burden of proving causation under subordinate bias liability. *City of Vancouver v. Public Employment Relations Commission*, 180 Wn. App. at 356-57.

Mayor Vikki Bonfield fired Daniel Vargas after a March 29, 2013 meeting among Chief William Derbonne, Vargas, and Bonfield. During the meeting, the trio discussed a recent complaint from police officer Bill Guinn of Vargas' ongoing "trash talking,"

16

incidents of insubordination, and Vargas' failure to complete required reports. Vargas grew irate and refused to recognize any unacceptable professional behavior. Still he acknowledged that he trash talked and declared he had no intention of stopping. Mayor Bonfield asked Vargas how to resolve the conflict between Derbonne and Vargas. Vargas replied that he would only communicate with Derbonne via e-mail.

In one sense, Daniel Vargas' reporting of Chief William Derbonne's unlawful behavior to outside entities precipitated Vargas' termination from employment. In other words, the advancement of public policy presents as a "but for" cause of the firing. But the employee must show that the animus of the subordinate constituted a "substantial factor" in the termination. *Allison v. Housing Authority of the City of Seattle*, 118 Wn.2d 79, 81, 821 P.2d 34 (1991). The undisputed facts show that Mayor Vikki Bonfield lacked knowledge of any reporting by Daniel Vargas. Vargas' failure to discuss with Bonfield a reasonable solution to the hostility within the police department, Vargas' failure to accept any responsibility for unprofessional behavior, and Vargas' pledge to continue trash talking may constitute sufficient independent grounds for the firing of Vargas that break the chain of causation from the animus that developed between Derbonne and Vargas because of any reporting of misconduct. We would want to grant the City of Asotin a full opportunity to explore the ramifications of subordinate bias liability before reversing summary judgment.

No. 35093-2-III
*Vargas v. City of Asotin*

## CONCLUSION

We affirm the summary judgment dismissal of Daniel Vargas' suit for wrongful termination in violation of public policy.

A majority of the panel has determined this opinion will not be printed in the Washington Appellate Reports, but it will be filed for public record pursuant to RCW 2.06.040.

_____
Fearing, J.

I CONCUR:

_____
Siddoway, J.

18

No. 35093-2-III

PENNELL, A.C.J. (dissenting) — This case asks whether a supervisor's discriminatory animus can be imputed to a final decision-maker who fires an employee. As noted by the majority, Daniel Vargas has proffered at least some evidence that his supervisor, Asotin Police Chief William Derbonne, was aware Mr. Vargas had engaged in whistleblowing activities prior to Mr. Vargas's termination. Mr. Vargas has also proffered evidence that Chief Derbonne was angered by Mr. Vargas's complaints and desired Mr. Vargas be fired. Nevertheless, the majority concludes Mr. Vargas cannot make out a claim for retaliatory discharge because Mr. Vargas has not pointed to any evidence showing the ultimate decision-maker, Asotin Mayor Vikki Bonfield, was aware of Mr. Vargas's whistleblowing activities. The majority thus concludes that Mr. Vargas lacks evidence demonstrating that his protected conduct caused the termination.

I disagree. Mr. Vargas has submitted sufficient proof that Chief Derbonne's retaliatory animus was connected to Mayor Bonfield's termination decision through a theory of proximate cause known as "subordinate bias" or "cat's paw" liability. Under this theory, liability attaches when an employment decision is influenced by a biased subordinate, regardless of whether the employer's final decision-maker holds any personal bias or is aware of the subordinate's bias. Because Mr. Vargas has submitted facts in support of subordinate bias or cat's paw liability, I would reverse the trial court's summary judgment order.

*Elements of wrongful discharge in violation of public policy*

The common law tort of wrongful discharge in violation of public policy has traditionally been limited to four scenarios: "(1) where employees are fired for refusing to commit an illegal act; (2) where employees are fired for performing a public duty or obligation, such as serving jury duty; (3) where employees are fired for exercising a right or privilege, such as filing workers' compensation claims; and (4) where employees are fired in retaliation for reporting employer misconduct, i.e., whistleblowing." *Rose v. Anderson Hay & Grain Co.*, 184 Wn.2d 268, 276, 358 P.3d 1139 (2015) (quoting *Gardner v. Loomis Armored Inc.*, 128 Wn.2d 931, 936, 913 P.2d 377 (1996)).

When a plaintiff's wrongful discharge allegations fall into one of the four traditional scenarios, then the elements of the tort claim are guided by the Supreme Court's decision in *Thompson v. St. Regis Paper Co.*, 102 Wn.2d 219, 685 P.2d 1081 (1984). *Becker v. Cmty. Health Sys.*, 184 Wn.2d 252, 258-59, 359 P.3d 746 (2015). Under the *Thompson* standard, a plaintiff must show that he or she may have been terminated for reasons that contravene public policy. *Thompson*, 102 Wn.2d at 232. If this is satisfied, the burden shifts to the employer to prove dismissal was for other reasons. *Id*. at 232-33. It is only when a plaintiff's circumstances fall outside the traditional four types of a wrongful discharge scenario that a "more refined" analysis,

2

pursuant to the factors articulated by Professor Henry H. Perritt Jr.,[1] becomes relevant. *Becker*, 184 Wn.2d at 259.

Because Mr. Vargas has made a whistleblower allegation, his claims fall under the *Thompson* standard. Mr. Vargas must therefore show causation between his alleged whistleblowing and the City of Asotin's termination decision. *Wilmot v. Kaiser Aluminum and Chemical Corp.*, 118 Wn.2d 46, 68-69, 821 P.2d 18 (1991). However, establishing causation is "not an all or nothing proposition." *Rickman v. Premera Blue Cross*, 184 Wn.2d 300, 314, 358 P.3d 1153 (2015). Mr. Vargas need not show his whistleblowing activities were the sole basis for the City's termination decision. *Id.* It is enough that he show his whistleblowing was a substantial factor, motivating the City's decision to discharge him from employment. *Id.* In addition, because proof of an employer's true motivation can be difficult to obtain, a plaintiff such as Mr. Vargas can make an initial showing of causation by establishing his employer knew of his whistleblowing and then issued a termination decision. *See Wilmot*, 118 Wn.2d at 69.

Consistent with the *Thompson* standard, if Mr. Vargas can establish a prima facie case of causation, then the burden shifts to the City to prove Mr. Vargas was discharged

---

[1] The four Perritt elements of a public policy tort are: (1) a plaintiff must prove the existence of a clear public policy, (2) the plaintiff must prove that discouraging his or her conduct would jeopardize public policy, (3) the plaintiff must prove that his or her protected conduct caused dismissal, and (4) the employer must not be able to offer an overriding justification for the dismissal. HENRY H. PERRITT JR., WORKPLACE TORTS: RIGHTS AND LIABILITIES § 3.5, at 64 (1991).

for reasons other than whistleblowing. Alternatively, the City may avoid liability by showing that "despite [Mr. Vargas]'s public-policy-linked conduct," it had an overriding justification for the termination. *See Rickman*, 184 Wn.2d at 314 (quoting *Gardner*, 128 Wn.2d at 947).

*Mr. Vargas has established evidence of causation*

As noted by the majority, Mr. Vargas has produced evidence that his supervisor, Chief Derbonne, was aware of Mr. Vargas's whistleblowing. Specifically, the record includes a declaration from an Asotin reserve police officer, Bill Guinn, who asserts that Chief Derbonne admitted knowing Mr. Vargas "was reporting" him for illegal conduct involving wild game and firearms. Clerk's Papers (CP) at 92.[2]

The record also indicates Mr. Vargas's whistleblowing angered Chief Derbonne and led him to desire Mr. Vargas's termination. Reserve Officer Guinn maintains that Chief Derbonne was "relentless" in his complaints about Mr. Vargas. *Id.* at 91. Chief Derbonne expressed concern to Officer Guinn that Mr. Vargas was trying to get Derbonne in trouble and "someone needed to go," meaning either Derbonne or Vargas. *Id.* at 92. From Officer Guinn's declaration, it can be inferred that Derbonne knew about at least some of Mr. Vargas's whistleblowing activities and that Derbonne wanted

---

[2] It does not matter that Chief Derbonne failed to specify which agencies had received reports from Mr. Vargas. Any type of reporting, including an internal complaint, can constitute whistleblowing. *See, e.g., Rickman*, 184 Wn.2d at 305-06 (whistleblowing can be limited to an internal grievance).

4

Mr. Vargas fired as a result.

Despite evidence of Chief Derbonne's knowledge and retaliatory animus, the majority reasons Mr. Vargas's complaint cannot proceed because Chief Derbonne was not the one who fired Mr. Vargas. That person was Mayor Vikki Bonfield. As pointed out by the majority, Mr. Vargas has not uncovered any evidence indicating Mayor Bonfield was aware of Mr. Vargas's whistleblowing activities prior to his termination. Nor is there any evidence that Mayor Bonfield personally shared Chief Derbonne's retaliatory animus.

I disagree with the majority's conclusion that Mayor Bonfield's lack of direct knowledge shields the City from Mr. Vargas's claims. Mr. Vargas has stated a valid retaliation claim under a theory of causation that Division Two of our court has dubbed "subordinate bias liability." *City of Vancouver v. Pub. Emp't Relations Comm'n*, 180 Wn. App. 333, 351-52, 325 P.3d 213 (2014); *Boyd v. State*, 187 Wn. App. 1, 20, 349 P.3d 864 (2015).[3] Subordinate bias liability is based on agency principles. It applies when a subordinate, such as a mid-level supervisor, harbors bias against an employee and has

---

[3] As noted by the majority, the parties have not briefed the issue of subordinate bias liability. Instead, they both proceed under the assumption that Mr. Vargas can establish liability by proving either Chief Derbonne or Mayor Bonfield knew about Mr. Vargas's whistleblowing activities. Given the parties have not asked the court to differentiate between Derbonne's knowledge and that of Bonfield, I would not fault Mr. Vargas for failing to brief the issue of subordinate bias liability. By decoupling Derbonne and Bonfield's knowledge, the majority has resolved this case against Mr. Vargas in a manner that was not briefed or requested.

5

been delegated some sort of power or influence that triggers an employer's ultimate termination decision. *City of Vancouver*, 180 Wn. App. at 351. Under a theory of subordinate bias liability, an employer's decision-maker need not be aware of the subordinate's animus. Nor must the subordinate's influence be the sole cause of the employer's decision. It is, instead, enough that the subordinate's discriminatory-charged influence was a substantial factor in the ultimate employment decision. *Id.* at 356. This can happen when a subordinate's influence "sets in motion the events that culminate in the adverse employment action." *Id.* at 351.

Division Two's analysis of subordinate bias liability is based on the United States Supreme Court's decision in *Staub v. Proctor Hospital*, 562 U.S. 411, 131 S. Ct. 1186, 179 L. Ed. 2d 144 (2011). *Staub* referred to subordinate bias liability as "cats paw" liability[4] and found the theory of liability applicable to establishing proximate cause in an employment discrimination case.

---

[4] "The term 'cat's paw' originated in the fable, 'The Monkey and the Cat,' by Jean de La Fontaine. As told in the fable, the monkey wanted some chestnuts that were roasting in a fire. Unwilling to burn himself in the fire, the monkey convinced the cat to retrieve the chestnuts for him. As the cat carefully scooped the chestnuts from the fire with his paw, the monkey gobbled them up. By the time the serving wench caught the two thieves, no chestnuts were left for the unhappy cat." JULIE M. COVEL, THE SUPREME COURT WRITES A FRACTURED FABLE OF THE CAT'S PAW THEORY IN *STAUB V. PROCTOR HOSPITAL* [*STAUB V. PROCTOR HOSPITAL*, 131 S. CT. 1186 (2011)], 51 Washburn L.J. 159 (2011) (footnotes omitted). "[T]he monkey represents a supervisor, motivated by a discriminatory bias, who uses the employer or the employer's decision-maker to take adverse action against an employee. The cat represents an unbiased decision-maker who unknowingly disciplines an employee because of the supervisor's bias." *Id.* at 160 (footnotes omitted).

The facts in *Staub* are helpful to understanding the Supreme Court's causation analysis. Mr. Staub was a member of the United States Army Reserve, which sometimes caused him to take time off of work. Staub was eventually fired and then filed suit, claiming discrimination based on his military status. Even though there was no evidence that the individual who fired Staub harbored any such bias, Staub argued for liability because his supervisors had clearly exhibited bias and those supervisors had an influence on his employer's ultimate termination decision. *Staub*, 562 U.S. at 415. The Supreme Court agreed with Staub's theory of liability. The Court wrote that "if a supervisor performs an act motivated by antimilitary animus that is *intended* by the supervisor to cause an adverse employment action, and if that act is a proximate cause of the ultimate employment action, then the employer is liable" for discrimination.[5] *Id.* at 422 (footnote omitted). The Staub Court recognized that there may be multiple proximate causes of the final employment decision. *Id.* at 420. But that does not mean an employee cannot state a claim. It is only when an employer's ultimate termination decision is unrelated to the influence of biased supervisors that the employer will escape liability. *Id.* at 421.

Our state Supreme Court has never explicitly discussed subordinate bias or cat's paw liability, but the theory was implicit in the court's decision in *Allison v. Housing*

---

[5] The statutory basis for discrimination was the Uniformed Services Employment and Reemployment Rights Act of 1994. 38 U.S.C. §§ 4301-35. This provision prohibits adverse employment actions if an employee's membership in the uniformed services "is a motivating factor in the employer's action." 38 U.S.C. § 4311(c)(1).

*Authority of Seattle*, 118 Wn.2d 79, 821 P.2d 34 (1991). The facts of *Allison* make this plain. Ms. Allison raised complaints about age discrimination during her employment with the Seattle Housing Authority. Shortly after lodging the complaints, Ms. Allison's relationship with her supervisor soured and she began receiving less favorable performance evaluations. A new supervisor subsequently joined the housing authority and, due to budget cuts, was tasked with workforce reduction. The new supervisor opted to base the layoff decisions on prior performance evaluations and productivity. Ms. Allison was one of the individuals laid off. She subsequently filed suit for retaliatory discharge. Although Ms. Allison lacked evidence that the new supervisor harbored discriminatory animus or was aware of Ms. Allison's tensions with the previous supervisor, the Supreme Court held Ms. Allison had submitted sufficient proof of causation. *Id.* at 97-98.

By recognizing Ms. Allison could state a retaliation claim against her employer, without proof of any personal bias on the part of the employer's decision-maker, our high court sanctioned the applicability of subordinate bias or cat's paw liability. As the court explained, Ms. Allison presented a valid theory "that her supervisor . . . 'set up' Allison to be selected for layoff through, for example, giving her poor performance evaluations." *Id.* at 97. The court thus recognized that when a biased supervisor sets up an employee for termination by a final decision-maker, the employer cannot escape liability by

8

pleading ignorance or lack of bad faith. Instead, in such circumstances, the employee has alleged a viable claim of discrimination.

Applying the theory of subordinate bias or cat's paw liability to this case, it is apparent Chief Derbonne initiated the chain of events that ultimately resulted in Mr. Vargas's termination. A meeting was held on March 29, 2013, so that Chief Derbonne could present Mr. Vargas with a personnel action form. The form was prepared by Chief Derbonne and contained the Chief's complaints about Mr. Vargas's insubordinate behavior. Mayor Bonfield attended the March 29 meeting and discussed those problems with Mr. Vargas and Chief Derbonne, which the mayor described as Mr. Vargas's "trash-talking" and "refusal to take direction." CP at 33-34. There is no indication that Mayor Bonfield had direct knowledge of Mr. Vargas's problems prior to the March 29 meeting. Instead, it is apparent that Mayor Bonfield's knowledge came from Chief Derbonne. In addition, by her comments, Mayor Bonfield indicated that she had conferred with Chief Derbonne about Mr. Vargas's employment status. Specifically, Mayor Bonfield declared that "[t]ermination of employment was not the course of action that either the Chief or I preferred." *Id.* at 34. The only way Mayor Bonfield would have known of Chief Derbonne's purported preferences was if she had consulted with him.

Chief Derbonne's actions were sufficient to impute his bias to Mayor Bonfield. Although Mayor Bonfield's termination decision did not rest entirely on the information

9

obtained from Chief Derbonne, it was a substantial factor. Mayor Bonfield has declared that she dismissed Mr. Vargas because she "had every reason to believe that Mr. Vargas would continue to engage in the undesirable insubordination and negative commentary." *Id.* In other words, based on Mayor Bonfield's interactions with Mr. Vargas at the March 29 meeting, Mayor Bonfield concluded that Chief Derbonne's complaints about Mr. Vargas were not remediable. Under Mayor Bonfield's analysis, one simply cannot separate Chief Derbonne's allegations against Mr. Vargas from the final termination decision. Mr. Vargas has therefore made a sufficient showing that his termination was caused by anti-whistleblower animus.

*The City's evidence of independent justification does not justify summary judgment*

Because Mr. Vargas has presented prima facie evidence that he was terminated in violation of public policy, the burden shifts to the City to establish an alternate justification for its actions. To meet this burden, the City has proffered a complete denial of Mr. Vargas's claims. Contrary to Reserve Officer Guinn's assertions, Chief Derbonne denies he was aware of Mr. Vargas's whistleblowing activities. According to Chief Derbonne, his dissatisfaction with Mr. Vargas stemmed from Mr. Vargas's poor attitude and insubordination. Because Chief Derbonne claimed to be unaware of Mr. Vargas's whistleblowing, he has declared that Mr. Vargas's complaints played no part in his decision to issue the March 29 personnel action form.

10

The facts presented by the City are sufficient to thwart any motion by Mr. Vargas for summary judgment. But this does not mean the City is entitled to summary judgment. Instead, a jury should decide which set of facts are true, and whether Mr. Vargas's discharge was the result of discrimination or some other reason. *Boyd*, 187 Wn. App. at 21.

Despite its clear denial of Mr. Vargas's causation claim, the City argues it should be awarded summary judgment because it had an overriding justification for Mr. Vargas's termination. Specifically, the City points to the untenable situation created by Mr. Vargas when he said during the March 29 meeting that he would only communicate with Chief Derbonne through e-mail. According to the City, Mr. Vargas's behavior undermined public safety and the efficiency of the police department.

The City's position is misplaced. The "overriding justification" defense applies only in cases like *Gardner* where causation is not in dispute. 128 Wn.2d at 947. The issue in such cases is not whether the plaintiff's protected conduct was a substantial factor in an adverse employment decision. It is instead whether the employer's basis for termination was sufficiently compelling to override the employee's public-policy related behavior. *Id.* at 947-49. This is an issue of law, to be resolved by the court. *See id.* at 942 ("[T]he overriding justification element enables *this court* to weigh properly [the employer's] argument, which claims [its] workplace rule should trump any public

11

policies furthered by [the employee]'s actions.") (emphasis added). In the current case, there is no indication the City's public safety concerns were so dire that they justified terminating an employee who had engaged in protected whistleblowing activities. Given this state of the record, the City cannot escape a jury trial by claiming an overriding justification. Because the City has merely disputed Mr. Vargas's proof of causation, the case should go to trial.

## Conclusion

Employees claiming unlawful retaliation are at a "distinct disadvantage . . . because they must prove causation without the benefit of the employer's own knowledge of the reason for the discharge." *Allison*, 118 Wn.2d at 96. This disadvantage ought not to be exacerbated by allowing employers to avoid liability through creation of a firewall between final decision-makers and the supervisors who not only lay the groundwork for employment decisions, but also may harbor discriminatory animus. *See City of Vancouver*, 180 Wn. App. at 359. Instead, an employer's decisions should be analyzed holistically to discern whether discrimination has occurred under a theory of subordinate bias or cat's paw liability.

Because Mr. Vargas has proffered sufficient facts indicating his supervisor's discriminatory animus influenced the ultimate decision to discharge him from his

12

employment with the City of Asotin, I would reverse the trial court's summary judgment

order and remand for trial. I therefore dissent.

_____
Pennell, A.C.J.