# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| STATE OF WASHINGTON, | No. 50427-8-II |
| Respondent/Cross-Appellant, | |
| v. | |
| TERENCE FRANKLIN HOPWOOD, | UNPUBLISHED OPINION |
| Appellant/Cross-Respondent. | |

SUTTON, J. — Terrence Franklin Hopwood appeals his convictions for promoting commercial sex abuse of a minor (GSW)[1] and second degree unlawful possession of a firearm. He argues that (1) the evidence was insufficient to convict him of commercial sex abuse of a minor; (2) the trial court violated the prohibition against double jeopardy by allowing the State to amend the firearm charge; (3) the trial court erred by admitting GSW's statements to an undercover detective; (4) he was arrested without probable cause and questioned without *Miranda*[2] warnings; (5) the State committed prosecutorial misconduct by introducing undisclosed expert opinion testimony; (6) he was denied effective assistance of counsel; (7) he was denied his right to present a defense; (8) the trial court erred by admitting a detective's testimony designed to arouse the

---

[1] The charges involve a minor victim. As a result, we refer to the victim by her initials as opposed to her full name. *See* RCW 7.69A.030(4).

[2] *Miranda v. Arizona,* 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

jury's passion and prejudice; and (9) the trial court erred by allowing the jury to have Hopwood's cell phone during deliberations. We affirm.[3]

FACTS

I. BACKGROUND FACTS

On March 30, 2016, the State charged Hopwood with promoting commercial sexual abuse of a minor, GSW, and first degree unlawful possession of a firearm. The following facts relate to the efforts by law enforcement to recover GSW.

Detective Ryan Larson worked with the Lakewood Police Department and was a member of the federally developed South Sound Child Exploitation Task Force (Task Force) that investigates human trafficking. He has been trained and certified by the Federal Bureau of Investigation to conduct undercover work related to recovering juveniles engaged in prostitution.

In March 2016, he received information from a Task Force member about a juvenile who was listed as a runaway from Oregon and suspected to be working as a prostitute. He and other Task Force members learned of a Backpage.com[4] ad and photographs related to this runaway juvenile. The ad included photographs, offered prostitution services, and listed a telephone number beginning with a 971 area code. This ad was found in the "escorts" section, which existed

---

[3] Because we affirm Hopwood's convictions, we do not separately address the State's cross-appeal.

[4] Backpage.com operated an online classified advertising service. *In re Pers. Restraint of Hopper*, 4 Wn. App. 2d 838, 841, 424 P.3d 228 (2018), *review denied*, 439 P.3d 1064 (2019). The United States Department of Justice seized Backpage.com in April 2018. *In re Pers. Restraint of Hopper*, 4 Wn. App. 2d at 841 n.2 (citing Press Release, U.S. Dep't of Justice, Justice Department Leads Effort to Seize Backpage.Com, the Internet's Leading Forum for Prostitution Ads, and Obtains 93-Count Federal Indictment (April 9, 2018), https://www.justice.gov/opa/pr/ justice-department-leads-effort-seize-backpagecom-internet-s-leading-forum-prostitution-ads).

on Backpage.com for the sole purpose of prostitution. Verbatim Report of Proceedings (VRP) (Feb. 21, 2017) at 350-51.

On March 29, while acting undercover, Detective Larson exchanged phone calls and text messages with the telephone number listed in the ads. He began exchanging text messages with the 971 number at 9:43 a.m. GSW sent him seven photographs, three of which showed a naked female body. Detective Larson confirmed that some of the photographs were the same photos as those posted on the Backpage.com ads. He testified that GSW also asked him for a picture to prove he was not a cop, but he convinced her that he was not law enforcement and he did not send a picture.

They agreed to a transaction for sexual services and to meet at McDonald's near the State Route (SR) 512 Park and Ride in Lakewood for a "date." VRP (Feb. 21, 2017) at 344, 385. Detective Larson rented a room at a nearby motel. Detective Larson testified that he stayed in contact with the 971 number while they were en route to the "date." Prior to meeting face to face, Detective Larson confirmed the identity of the juvenile they were trying to recover as GSW through the photograph provided to him by the Task Force, the Backpage.com ad, the photographs sent to him from the 971 number, and GSW's driver's license records.

Task Force members set up surveillance around the McDonald's where the agreed meeting was to take place. GSW sent undercover Detective Larson a text stating that she was being driven to the "date" by an Uber driver. The last text message before the two met was sent at 1:07 p.m.

Other Task Force members advised Detective Larson that they observed GSW riding in a black Hummer being driven by a male arriving at the McDonald's near the park and ride. Shortly thereafter, the Hummer parked in the park and ride lot.

3

Once GSW arrived, undercover Detective Larson picked her up and drove her to the motel room he had rented for their "date." After they entered the room, GSW sat on the bed, took off her shirt, and asked for the "donation" that they had agreed to earlier. To confirm that she was there to engage in prostitution, undercover Detective Larson told GSW that he had the agreed upon $100, but he also wanted anal sex and a blow job. GSW said she would do that for an additional $100. Detective Larson then alerted the arrest team to enter the room and they arrested GSW for prostitution.

Detective Douglas Shook of the Pierce County Sheriff's Department was a member of the Task Force conducting surveillance at the McDonald's. He approached the driver of the black Hummer, later identified as Hopwood, who was sitting on a bench in the parking lot. Detective Shook identified himself and explained to Hopwood that he was being contacted about the person he had just dropped off. Detective Shook then asked Hopwood for identification, which he provided. Hopwood said he had just given a friend a ride. Detective Shook asked him if he had any firearms in his possession and Hopwood told him that he did not. However, another surveillance officer removed a firearm located on Hopwood's person.

Hopwood was arrested and transported to the Lakewood Police Department where Detective Larson advised him of his constitutional rights and Hopwood agreed to give a recorded statement. Detective Larson secured a cell phone and the firearm seized from Hopwood, impounded Hopwood's vehicle, and asked for Hopwood's consent for the vehicle to be searched, which he gave.

After he interviewed Hopwood, Detective Larson made a preliminarily examination of Hopwood's cell phone with his consent and found a message from GSW describing her "date"

4

with the undercover detective and included part of his text message to her.  Detective Larson also found text messages between Hopwood and GSW dated March 28 and noted that the digital images of GSW on Hopwood's cell phone matched the digital images of GSW he had seen previously on GSW's Backpage.com ad.  Detective Larson also test-fired the firearm seized from Hopwood and determined that the firearm was operable.

Hopwood's cell phone was turned over for examination to Detective Kenneth Lewis of the Puyallup Police Department, who has training and expertise in digital forensics.  He extracted the data and contents from Hopwood's cell phone, including text messages, photographs, cell phone calls, applications, history, and global position system (GPS) location details.  Detective Lewis reviewed the Backpage.com account subscriber information and confirmed that it was Hopwood's account based on Hopwood's own photograph on the cell phone.  Detective Lewis determined which cell phone towers were nearest to Hopwood's cell phone on March 28 and 29.

Detective Lewis prepared a number of extraction reports later identified and admitted at trial as Exhibits 39-41, 45, 47, and 51.  The reports were a compilation of the extracted cell phone data and consisted of the text messages, phone call logs, images, data files, and timeline files from Hopwood's cell phone.  Detective Lewis grouped the extraction reports into three categories of evidence: (1) the text messages and digital images GSW exchanged with undercover Detective Larson to set up their "date" on March 29; (2) text messages and digital images and cell phone calls between GSW and Hopwood on March 28 and 29 prior to GSW meeting with undercover Detective Larson for their "date;" and (3) text messages, phone calls, and digital images sent and received on March 28 and 29 between Hopwood and a third party, identified as Bosko, who was listed as a contact in Hopwood's cell phone.

Detective Lewis verified that the accounts on the cell phone belonged to Hopwood. He also determined that Hopwood was near the Sea-Tac Airport on March 28 and at the McDonald's at the SR 512 Park and Ride in Lakewood on March 29 at the time GSW arrived for her "date" with undercover Detective Larson.

Detective Lewis extracted the following relevant text messages and telephone calls between Hopwood and Bosko on March 28 and 29 prior to GSW's "date" with undercover Detective Larson, and the text messages between GSW and undercover Detective Larson on March 29 to set up their "date."

On March 28, Hopwood used his cell phone to take photos of GSW which he then sent to Bosko. Later at trial, Detective Lewis identified these images of GSW that were taken by Hopwood on March 28 as Exhibits 41, 45, 47, and 51 and enlarged photos of the same images of GSW as Exhibits 42-44, 46.

Starting at 7:36 p.m. that same evening, Hopwood's cell phone also sent and received a series of text messages and telephone calls to and from GSW related to a meeting near the Sea-Tac airport. At 8:46 p.m., Hopwood called Bosko and then they exchanged several text messages:

> [Bosko]: . . . Where the hoes at, I know you have some [sic].
> [Hopwood]  I got one now she's working for me.
> [Bosko]  Any extras?
> . . . .
> [Hopwood]  She Solo.
> [Bosko]  Yep, yep.

Ex. 51 at 2-3.

Detective Lewis explained at trial that these texts were exchanged right before Hopwood's cell phone was used to take photographs of GSW. Hopwood then sent a text message stating, "$250 for 1hr (sic) Qv for $150" and attached a photograph.[5] Hopwood sent another photograph to Bosko which the Task Force confirmed through Detective Lewis was the same photograph that the Task Force had found on GSW's Backpage.com ad.

On March 29 at 9:56 a.m., Hopwood called Bosko. Bosko responded by text message at 10:03 a.m., texting, "I'm trying to get on, help your boy out?" VRP (Feb. 27, 2017) at 980; Ex. 51 at 5. Later, Hopwood texted at 10:11 a.m., "Say mane from pimp to pimp I'm selling my hoe and you can make money off her." VRP (Feb. 27, 2017) at 980; Ex. 51 at 5.

On March 29, undercover Detective Larson sent a text message to the 971 number that stated, "I'm gonna get a room right off of I-5 and Hwy 512 in tacoma." Ex. 51 at 5. At 12:28 p.m., Hopwood's cell phone received a text message from the 971 number that said the exact same thing, including grammar and case lettering.

The 971 number sent three messages to undercover Detective Larson regarding the meet-up location. At 12:41 p.m., undercover Detective Larson sent a text message to the 971 number that said, "10417 pacific hwy sw Tacoma, WA 98499." Ex. 51 at 5.

At 12:43 p.m., Hopwood's cell phone received a text message from the 971 number that said, "Ok see u shortly I'm by 74th nd south tocoma way." Ex. 51 at 5. At the time undercover Detective Larson received the message referencing 74th and South Tacoma Way, Hopwood's cell

---

[5] The term "QV" is recognized from Backpage.com and other prostitution ads and means "quick visit." VRP (Feb. 27, 2017) at 977.

phone was "pinging"[6] off the cell tower that was located closest to that intersection. At 1:02 p.m., Hopwood's cell phone placed a call that lasted for 30 seconds to the 971 number. Detective Lewis verified that it was Hopwood's cell phone that sent and received text messages and photographs from the 971 number, and it was Hopwood's cell phone that also sent and received text messages and photographs of GSW to Bosko as described in the extraction reports.

## II. PRETRIAL MOTIONS

### A. MOTION TO SUPPRESS POST-ARREST CUSTODIAL STATEMENTS

Before trial, Hopwood filed a CrR 3.5 motion to suppress his post-arrest statements arguing that he was questioned without *Miranda* warnings after he was detained and arrested.[7] The State argued that because he was given *Miranda* rights, his post-arrest statements were admissible.

Both Detectives Larson and Shook testified at the CrR 3.5 hearing consistent with the facts above. The trial court found that Detective Larson's testimony was credible, that the conversation between Detective Shook and Hopwood at the SR 512 Park and Ride was not a "custodial interrogation," and that *Miranda* warnings were not required to be given at that time. Clerk's Papers (CP) at 189. The trial court also found that Hopwood was given his *Miranda* warnings from a preprinted form at the Lakewood Police Department, he understood them, he asked no questions, and he signed the form. The trial court ruled that Hopwood was fully advised of his *Miranda* rights and made a knowing, voluntary, and intelligent waiver of those rights. The trial

---

[6] "Pinging" here, refers to using geolocation data to locate the location of an electronic device. *See* VRP (Feb. 27, 2017) at 964.

[7] At the CrR 3.5 hearing, Hopwood did not challenge the arrest or the seizure of the evidence (the cell phone and the firearm) as unlawful.

court entered written findings of fact and conclusions of law, denied Hopwood's motion to suppress, and ruled that Hopwood's entire interview was admissible at trial.

B. MOTION TO ADMIT GSW'S STATEMENTS

Before trial, the State said that it intended to move to admit GSW's cell phone calls, text messages, and oral statements (hereinafter collectively referred to as statements) to the undercover detective, Detective Larson, and filed a memorandum outlining its offer of proof. The State argued that GSW's statements were admissible under ER 801(d)(2)(v)[8] because Hopwood and GSW were engaged in a conspiracy to engage in acts of prostitution and her statements were made to the undercover detective in furtherance of that conspiracy. Hopwood also filed a memorandum and moved to suppress GSW's statements arguing that the State could not authenticate GSW's statements. After additional arguments, the State filed a supplemental memorandum arguing that a victim of a crime can be a coconspirator under the conspiracy statute and renewed its motion to admit.

The trial court ruled that GSW's statements to undercover Detective Larson were not admissible as statements of a coconspirator because GSW was a victim of the crime, and thus, she was legally incapable of entering into a conspiracy with Hopwood to engage in prostitution. The trial court then ruled that GSW was unavailable as a witness under ER 804(a)(5) and would not testify, but that GSW's statements were admissible as "statements against interest" under ER 804(b)(3). CP at 198. Hopwood objected to the court's ruling.

---

[8] ER 801(d)(2)(v) provides that "a statement by a coconspirator of a party during the course and in furtherance of the conspiracy" is not hearsay.

III. TRIAL

A. MOTION TO DISMISS AND MOTION TO AMEND THE FIREARM CHARGE

Before trial, the State moved to amend the original firearm charge because the information had omitted required language related to Hopwood's prior conviction for first degree attempted robbery. The State intended to prove the prior conviction as the prior serious offense required for the firearm charge and provided relevant documents it had just received. The State also stated that Hopwood's criminal history included the first degree attempted robbery conviction and the criminal history had been provided to defense counsel on March 30, 2016 at the outset of the case. On February 14, 2017, the trial court granted the motion to allow the correction to the original firearm charge. The jury was sworn in two days later.

Several days later during trial, defense counsel brought a motion to dismiss the original firearm charge arguing that the prior attempted robbery conviction was not constitutionally valid because Hopwood had not been apprised of the elements of the charge. After arguments, the trial court granted the motion to dismiss the original firearm charge.

Immediately following that ruling, the trial court considered the State's pending motion to amend the firearm charge. The State argued that the amendment was not a new charge and Hopwood had been on notice of a possible amendment to the firearm charge since the outset of the case on March 30, 2016, based on the prosecutor's declaration of probable cause. The prosecutor's declaration of probable cause described Hopwood's prior drug convictions and prior King County convictions for third degree assault and taking a motor vehicle without permission, and stated "which if they are confirmed as his only convictions would result in an amendment of the charge to [second degree unlawful possession of a firearm]." CP at 4.

The trial court granted the State's motion to amend the information. The trial court ruled that Hopwood had been on notice of the firearm charge since March 2016, he would be able to present a defense to the charge, and he would not be prejudiced. The State filed the second amended information on February 21, 2017.

B.  TRIAL TESTIMONY

Detectives Larson and Lewis testified consistent with the above facts. Detective Nichole Faivre, Tacoma Police Department, and Alison Bogar, King County Deputy Prosecuting Attorney, also testified.

1. Detective Faivre's Testimony

After GSW's arrest, Detective Faivre booked her into Remann Hall, a juvenile detention facility in Tacoma. She testified that she did not have the option to book GSW into the Pierce County Jail because GSW was under the age of eighteen. Detective Faivre filled out the booking form that included GSW's name, the facility she was being booked into, and her date of birth. When asked specifically what GSW's date of birth was, Detective Faivre stated the month and date but could not recall the year. The State then handed her Detective Larson's report, and after refreshing her recollection, she confirmed the year of GSW's birth as 1998. Hopwood objected based on hearsay. The State argued that this testimony was proper because Detective Faivre had refreshed her recollection. The trial court overruled the objection.

The State objected when Hopwood stated that he intended to impeach Detective Faivre with GSW's statements that she had worked with two other men related to her prostitution services. The trial court asked Hopwood whether, given the court's earlier ruling that GSW's statements were admissible only as statements against interest under ER 804(b)(3), he could corroborate

11

GSW's statements to Detective Faivre. Hopwood said he could not. The trial court sustained the State's objection and instructed Hopwood's counsel that he could not inquire into that area.

2. Alison Bogar's Testimony

Bogar testified that Hopwood had three prior felony convictions in King County. She identified certified copies of three exhibits. Those three exhibits were the King County charging documents for Hopwood, the statements of defendant on plea of guilty, and the judgments and sentences to establish the felony convictions for taking a motor vehicle without permission, unlawful possession of a controlled substance (cocaine), and criminal solicitation to deliver (cocaine). All three exhibits were admitted.

C. OTHER EVIDENTIARY RULINGS

The trial court made several evidentiary rulings relevant on appeal. First, Hopwood objected to Detective Larson's testimony regarding the purpose of the Task Force. Specifically, Hopwood objected to the following exchange:

> [The State]: So with the information you received from [the National Center for Missing and Exploited Children] and through Special Agent McNeal, was the runaway status more important or was the Backpage and juvenile more important?
>
> [Detective Larson]: Juvenile, Backpage, runaway, from out of state, all—I mean, huge red flags which made it a priority to recover this girl that was so far away from home.
>
> [The State]: How does it affect what you want to do hearing that it's not just a juvenile but an out-of-state juvenile who is a runaway?

VRP (Feb. 21, 2017) at 382-83. Hopwood argued that the testimony "goes to the passion of the jury, not evidence. It's irrelevant. I think the detective's motive isn't relevant." VRP (Feb. 21, 2017) at 383. The trial court overruled his objection and the State proceeded.

Second, Hopwood objected to the State's eliciting testimony by Detective Larson that he test-fired Hopwood's gun and found it to be operable. Hopwood argued that this testimony was late discovery and undisclosed "expert testimony." VRP (Feb. 22, 2017) at 475-76. The trial court ruled that this testimony was not expert testimony or undisclosed discovery and overruled the objection.

D. INSTRUCTIONS, VERDICT, AND SENTENCING

The trial court instructed the jury on both charges. As to the firearm charge, the trial court instructed the jury that they must determine whether Hopwood had "previously been convicted of taking a motor vehicle without possession and/or solicitation to deliver a controlled substance and/or solicitation to deliver a controlled substance." CP at 105 (capitalization omitted). The jury found Hopwood guilty of promoting commercial sexual abuse of a minor and unlawful possession of a firearm in the second degree. At sentencing, the trial court entered an order of dismissal of the original firearm charge. Hopwood appeals.

ANALYSIS

I. SUFFICIENCY OF THE EVIDENCE OF GSW'S AGE

Hopwood argues that there was insufficient evidence to prove his conviction for the promotion of commercial sex abuse of a minor because the State failed to prove an essential element of the charge; specifically, that GSW was under the age of eighteen. We disagree.

Due process requires that the State prove all material elements of the charge. U.S. CONST. amend XIV, § 1; *State v. W.R.,* 181 Wn.2d 757, 761-62, 336 P.3d 1134 (2014). "Evidence is sufficient to support a guilty verdict if any rational trier of fact, viewing the evidence in the light most favorable to the State, could find the elements of the charged crime beyond a reasonable

doubt." *State v. Cardenas-Flores*, 189 Wn.2d 243, 265, 401 P.3d 19 (2017). We interpret all reasonable inferences in the State's favor. *State v. Hosier*, 157 Wn.2d 1, 8, 133 P.3d 936 (2006).

Direct and circumstantial evidence carry the same weight. *State v. Varga*, 151 Wn.2d 179, 201, 86 P.3d 139 (2004). "[C]redibility determinations are for the trier of fact and are not subject to review." *State v. Cantu*, 156 Wn.2d 819, 831, 132 P.3d 725 (2006). "'Circumstantial evidence is evidence of facts or circumstances from which the existence or nonexistence of other facts may be reasonably inferred from common experience.'" *State v. Jackson*, 145 Wn. App. 814, 818, 187 P.3d 321 (2008), quoting WASHINGTON PRACTICE: WASHINGTON PATTERN JURY INSTRUCTIONS: CRIMINAL 5.01, at 124 (2d ed.1994). In a sufficiency of the evidence claim, the defendant "admits the truth of all of the State's evidence" and we view the evidence and all reasonable inferences in the light most favorable to the State. *Cardenas-Flores,* 189 Wn.2d at 265. We defer to the fact finder's determinations of witness credibility, persuasiveness of the evidence, and conflicting testimony. *Cardenas-Flores,* 189 Wn.2d at 266.

Here, Detective Faivre testified that after GSW was arrested, she booked GSW into Remann Hall and did not have the option to book GSW into the Pierce County jail because GSW was under eighteen years of age. Detective Faivre filled out the booking form noting GSW's name, the facility she was being booked into, and her date of birth. When asked specifically what GSW's date of birth was, Detective Faivre stated the month and date but could not recall the year. The State handed her Detective Larson's report and, after refreshing her recollection, she confirmed 1998 as the year of GSW's birth. Hopwood objected based on hearsay. The State argued that this testimony was proper because Detective Faivre had refreshed her recollection. The trial court overruled Hopwood's objection.

Both Detectives Faivre and Larson testified that GSW was the juvenile runaway from Oregon allegedly engaged in prostitution and was the subject of the Task Force recovery efforts on March 29, 2016.

Viewing the evidence and all reasonable inferences from the evidence in the light most favorable to the State, we hold that the State presented sufficient evidence such that a rational trier of fact could find beyond a reasonable doubt that GSW was less than eighteen years old. Thus, Hopwood's sufficiency claim fails.

## II. DOUBLE JEOPARDY

Hopwood argues that when he was charged with first degree unlawful possession of a firearm at the time the jury was sworn in on February 16, 2017, double jeopardy attached at that point, and when the trial court orally granted his motion to dismiss the original firearm charge during trial, that jeopardy terminated, and the oral dismissal ruling constituted a final order amounting to an acquittal on that charge. He argues that the trial court erred by immediately granting the State's motion to amend the charge to a lesser degree after it had just dismissed the greater degree charge. We disagree and hold that Hopwood's claim fails.

"'The constitutional guaranty against double jeopardy protects a defendant . . . against multiple punishments for the same offense.'" *State v. Mutch,* 171 Wn.2d 646, 661, 254 P.3d 803 (2011) (quoting *State v. Noltie,* 116 Wn.2d 831, 848, 809 P.2d 190 (1991); *see* U.S. Const. Amend. V; WASH. CONST. art. I, § 9. A double jeopardy claim is of constitutional proportions and may be raised for the first time on appeal. *State v. Land,* 172 Wn. App. 593, 598, 295 P.3d 782 (2013). "We review the issue of double jeopardy de novo." *City of Auburn v. Hedlund,* 137 Wn. App. 494, 503, 155 P.3d 149 (2007). Double jeopardy bars a retrial if: jeopardy attached, jeopardy

terminated, and the defendant is again in jeopardy for the same offense. *State v. Pruitt*, 145 Wn. App. 784, 795, 187 P.3d 326 (2008).

Our Supreme Court in *State v. Collins* clarified the rule that for purposes of double jeopardy, a trial court's oral ruling is not final. 112 Wn.2d 303, 305, 771 P.2d 350 (1989). Rather, a trial court's oral ruling is, "'no more than an expression of its informal opinion at the time it is rendered. It has no final or binding effect unless formally incorporated into the findings, conclusions, and judgment.'" *Collins*, 112 Wn.2d at 306 (quoting *State v. Mallory*, 69 Wn.2d 532, 533-34, 419 P.2d 324 (1966). The court in *Collins* concluded that the trial court's oral ruling dismissing the assault charge in that case was not final and did not constitute an acquittal for double jeopardy purposes when the trial court later reversed itself and reinstated the charge. *Collins*, 112 Wn.2d at 306. Under CrR 2.1, the State may amend a criminal charge in the midst of its case in chief when the amendment is to a lesser degree of the same charge without violating a defendant's constitutional rights to receive notice of the charges and present a defense to those charges. *State v. Pelkey,* 109 Wn.2d 484, 491, 745 P.2d 854 (1987).

Here, the trial court's oral ruling did not amount to an acquittal of the original firearm charge. *See Collins*, 112 Wn.2d at 306. The trial court properly granted the State's CrR 2.1 motion to amend because there was no prejudice to Hopwood. *See Pelkey,* 109 Wn.2d at 491. The trial court's subsequent written order dismissing the original firearm charge did not implicate or violate double jeopardy. Because double jeopardy was not implicated or violated, we hold that Hopwood's claim fails.

### III.  ADMISSIBILITY OF GSW'S STATEMENTS

Hopwood initially argues that GSW's statements to undercover Detective Larson were not properly authenticated, they were testimonial and their admission violated his right of confrontation, and the trial court erred by admitting them as statements against penal interest. Hopwood's counsel conceded at oral argument that GSW's statements were properly authenticated. Wash. Court of Appeals oral argument, *State v. Hopwood*, No. 50427-8-II (Jan. 14, 2019), at 33 min., 58 sec. to 34 min., 22 sec. (on file with the court). Thus, we consider only whether GSW's statements are testimonial and admissible. We hold that GSW's statements are not testimonial and they are admissible as statements of a coconspirator under ER 801(d)(2)(v), and thus, Hopwood's claim fails.

### A.  CONFRONTATION CLAUSE

Hopwood argues that because GSW's statements to the undercover detective were testimonial under *Crawford v. Washington*,[9] the trial court's admission of this evidence violated his right of confrontation. We disagree.

A criminal defendant has a constitutional right "to be confronted with the witnesses against him." U.S. CONST. amend. VI. Therefore in a criminal trial, the State cannot introduce a testimonial statement from a nontestifying witness unless the witness is unavailable and the defendant had a prior opportunity to cross-examine the witness. *Crawford,* 541 U.S. 36, 68, 124 S. Ct. 1354, 158 L. Ed. 2d 177 (2004). The confrontation clause applies only to witnesses who make testimonial statements. *Crawford,* 541 U.S. at 68. A typical testimonial statement is a

---

[9] 541 U.S. 36, 61, 124 S. Ct. 1354, 158 L. Ed. 2d 177 (2004).

solemn declaration intended to establish some fact. *Crawford,* 541 U.S. at 51. Further, a statement is testimonial when its primary purpose is to establish facts relevant to a criminal prosecution. *Davis v. Washington,* 547 U.S. 813, 822, 126 S. Ct. 2266, 165 L. Ed. 2d 224 (2006). We review alleged confrontation clause violations de novo. *State v. Jasper*, 174 Wn.2d 96, 108, 271 P.3d 876 (2012). We review a trial court's ruling on the admissibility of evidence for an abuse of discretion. *State v. Clark*, 187 Wn.2d 641, 648, 389 P.3d 462 (2017).

Here, there is no evidence that GSW suspected at the time that she was communicating with the undercover detective that her statements might be used as evidence in court or that they were given during a police interrogation. We hold that GSW's statements to undercover Detective Larson were not made for purposes of a police interrogation and thus, they were not testimonial and *Crawford* is not implicated. Thus, because *Crawford* is not implicated, we hold that Hopwood's right of confrontation was not violated, and his claim fails.

B. ADMISSIBILITY

Hopwood next argues that the trial court erred in admitting GSW's statements as statements against penal interest under ER 804(b)(3).[10] We hold that GSW's statements are admissible as statements of a coconspirator.

We may uphold a trial court's evidentiary ruling on any grounds supported by the record. *State v. Williams,* 137 Wn. App. 736, 743, 154 P.3d 322 (2007). A trial court abuses its discretion by misapplying evidentiary rules. *State v. Fisher,* 165 Wn.2d 727, 745, 202 P.3d 937 (2009).

---

[10] Under ER 804(b)(3), "[i]n a criminal case, a statement tending to expose the declarant to criminal liability is not admissible unless corroborating circumstances clearly indicate the trustworthiness of the statement."

Under ER 801(d)(2)(v), "[a] statement is not hearsay if . . . [t]he statement is offered against a party and is . . . a statement by a coconspirator of a party during the course and in furtherance of the conspiracy." RCW 9A.28.040(1) provides that "[a] person is guilty of criminal conspiracy when, with intent that conduct constituting a crime be performed, he or she agrees with one or more persons to engage in or cause the performance of such conduct, and any one of them takes a substantial step in pursuance of such agreement." "A conspiracy is a plan to carry out a criminal scheme together with a substantial step toward carrying out the plan." *State v. Williams*, 131 Wn. App. 488, 496, 128 P.3d 98.

A formal agreement is not essential to the formation of a conspiracy, and can be shown by a "'concert of action, all the parties working together understandingly, with a single design for the accomplishment of a common purpose.'" *State v. Smith*, 65 Wn. App. 468, 471, 828 P.2d 654 (1992) (internal quotation marks omitted) (quoting *State v. Casarez-Gastelum*, 48 Wn. App. 112, 116, 738 P.2d 303 (1987)). "Proof of a conspiracy may be established by overt acts and 'much is left to the discretion of the trial court.'" *Smith*, 65 Wn. App. at 471-72 (quoting *Casarez-Gastelum*, 48 Wn. App. at 116). But a conspiracy does not require that all of the criminal elements of the plan be proposed and agreed to at the same instant in time. *See Williams*, 131 Wn. App at 496. "[C]ircumstantial evidence may provide proof of a conspiracy." *State v. Barnes*, 85 Wn. App. 638, 664, 932 P.2d 669 (1997) (finding that defendant's acquaintance, business transactions, ownership of the home where the co-conspirator lived, and unreported income was sufficient to prove that a conspiracy existed).

Here, the trial court entered the following unchallenged findings of fact regarding GSW's statements to the undercover detective:

On March 30, 2016, Det. Larson initiated communication with a person he thought was [GSW], a confirmed juvenile runaway from Oregon, intending to set up a prostitution date with her so that she could be recovered and returned to her home. The communication included cell phone calls and text messages. As a result of the conversation with Det. Larson, [GSW] appeared at the agreed-upon location, at the approximate time, got into Det. Larson's car, went with him to a motel, and entered the room with him. [GSW] then engaged in conversation with Det. Larson wherein she asked for her "donation" and then agreed to a "blow job" and "anal" sex with Det. Larson in exchange for additional money. [GSW] also put condoms on a dresser and took off her shirt.

The communication between Det. Larson and [GSW] was entirely dedicated to setting up and confirming the specifics of their prostitution date. The telephone and text message discussions included words and phrases that could have had more than one meaning, and that were not directly about illegal acts, but that were clearly understood by Det. Larson, and apparently by [GSW], to be about their "date," wherein illegal acts (sexual acts in exchange for money) would occur. In other words, while individual phrases could have innocent interpretation, when considered in the context of the entire conversation, and with the [B]ackpage.com ad as the backdrop, the illegality of the conversation as a whole was obvious and apparent.

CP at 195-96.

Based on these findings, which are verities,[11] GSW's statements to the undercover detective offering to provide sexual services in exchange for a fee constitute a conspiracy to commit prostitution under RCW 9A.28.040(1). We agree with the State that RCW 9A.28.040(2)(a), (c), (e), and (f), do not exclude a victim of a crime, here GSW, from being a coconspirator (It shall not be a defense to criminal conspiracy that the person or persons with whom the accused is alleged to have conspired: has not been prosecuted or convicted; or is not

_____

[11] Unchallenged findings of fact are verities on appeal. *State v. Rankin*, 151 Wn.2d 689 709, 92 P.3d 202 (2004).

amenable to justice; or lacked the capacity to commit an offense; or is a law enforcement officers or other government agent who did not intend that a crime be committed.). Thus, GSW's statements to the undercover detective are not excluded under RCW 9A.28.040(2). Because GSW is a coconspirator to prostitution and her statements were made to the undercover detective in furtherance of that conspiracy, we hold that GSW's statements were admissible as statements of a coconspirator under ER 801(d)(2)(v).

IV. PROBABLE CAUSE TO ARREST AND POST-ARREST STATEMENTS

Hopwood argues that his arrest was unlawful because the State did not have probable cause to arrest him, and thus, the cell phone and firearm evidence should have been suppressed. Br. of App. at 9. He also argues that, because he was not given his *Miranda* warnings, his post-arrest statements should have been suppressed. Br. of App. at 9. The State argues that Hopwood failed to preserve this issue on appeal under RAP 2.5 and we should not consider it. Br. of Resp. at 28. Whether there was probable cause to arrest a defendant is a manifest constitutional issue properly raised for the first time on appeal under RAP 2.5(a)(3). Thus, we consider Hopwood's claim on its merits.

At the CrR 3.5 hearing, the State adduced testimony by Detective Larson and Detective Shook about Hopwood's arrest. Detective Larson testified that Hopwood drove GSW to McDonald's where GSW had just agreed by text to meet him for a "date" to provide him sexual services in exchange for a fee. After GSW arrived at the McDonald's, undercover Detective Larson picked her up and drove to the motel room that he had rented for their "date." Detective Shook testified that he observed Hopwood drop GSW off at McDonald's and that he approached Hopwood and asked him why he dropped a female off at McDonald's. Hopwood first claimed

that he dropped off a friend, but later claimed he was an Uber driver and had given GSW a ride. Hopwood did not explain why he was waiting for GSW after dropping her off. Hopwood said he did not know why he was being contacted and denied he had a firearm when first asked. Detective Shook observed another officer remove a firearm on Hopwood's person. Hopwood was arrested and placed in a vehicle to be transported to the Lakewood Police Department. Immediately upon Hopwood's arrival, Detective Larson advised Hopwood of his *Miranda* rights on a pre-printed form.

Based on the evidence presented, the trial court correctly concluded that the police had probable cause to arrest Hopwood. The trial court also properly concluded that after being advised of his *Miranda* rights, Hopwood knowingly, voluntarily, and intelligently waived them. Thus, we hold that the trial court did not err by admitting the cell phone and firearm evidence or Hopwood's post-arrest statements, and his claim fails.

## V. PROSECUTORIAL MISCONDUCT – LATE DISCOVERY

Hopwood argues that the prosecutor introduced "late discovery" when it elicited Detective Larson's testimony that he test-fired Hopwood's gun. Br. of Appellant at 11. He claims that this testimony was undisclosed expert opinion testimony. He argues that by introducing this "late discovery," the prosecutor violated his obligation to provide discovery under CrR 4.7(a) and dismissal of the charges is warranted under CrR 8.3(b), citing *State v. Michielli*, 132 Wn.2d 229, 243, 937 P.2d 587 (1997). We decline to consider this claim because Hopwood fails to adequately brief the issue.

RAP 10.3(a)(6) states, "The brief of the appellant or petitioner should contain . . . . [t]he argument in support of the issues presented for review, together with citations to legal authority and references to relevant parts of the record." Hopwood's only reference to the alleged "late discovery" is in a single line where he claims that "there were numerous instances where discovery was presented for the first time during the course of trial." Br. of Appellant at 13. Hopwood fails to provide specifics or cite to the record. We do not consider inadequately briefed argument. RAP 10.3(a)(6); *Cowiche Canyon Conservancy v. Bosley*, 118 Wn.2d 801, 809, 828 P.2d 549 (1992) (argument unsupported by citation to the record or authority will not be considered). Because Hopwood inadequately briefed this issue, we decline to consider his claim.

## VI. INEFFECTIVE ASSISTANCE OF COUNSEL

Hopwood argues that he was denied effective assistance of counsel because his counsel failed to move to suppress evidence of his arrest based on a lack of probable cause, failed to request a continuance based on the "late discovery" introduced by the State at trial, and failed to object when the trial court allowed the jury to have Hopwood's cell phone during deliberations.

We review ineffective assistance of counsel claims de novo. *Clark,* 187 Wn.2d at 649. To prevail on an ineffective assistance of counsel claim, a defendant must show both deficient performance and resulting prejudice. *Strickland v. Washington*, 466 U.S. 668, 687, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984). Counsel's performance is deficient if it falls below an objective standard of reasonableness. *State v. McFarland*, 127 Wn.2d 322, 334-35, 899 P.2d 1251 (1995). Our scrutiny of counsel's performance is highly deferential; there is a strong presumption of reasonableness. *McFarland*, 127 Wn.2d at 335.

23

To establish prejudice, a defendant must show a reasonable probability that the outcome of the trial would have differed absent the deficient performance. *State v. Grier*, 171 Wn.2d 17, 34, 246 P.3d 1260 (2011). If a defendant fails to establish either deficiency or prejudice, the ineffective assistance of counsel claim fails. *Grier*, 171 Wn.2d at 33-34. When an ineffective assistance claim is based on the improper admission of evidence, counsel must show that the objection to the evidence would have been sustained. *See State v. Johnston*, 143 Wn. App. 1, 20, 177 P.3d 1127 (2007).

As to the first two claims, Hopwood fails to support his claim with proper authority. RAP 10.3(a)(6); *Cowiche,* 118 Wn.2d at 809. Thus, we decline to consider these claims.

As to the third claim, Hopwood's cell phone was admitted as Exhibit 23 without objection. The trial court gave a limiting instruction regarding the jury's use of the cell phone during deliberations:

> EXHIBIT #23 is the cell phone. It is inside a manila envelope that holds it. During your deliberations, you may remove the cell phone from the envelope and examine it as you choose, but you SHALL not turn on or power up the cell phone or otherwise attempt to examine its contents in any way.

CP at 139.

Any objection by Hopwood's counsel regarding the jury's use of the cell phone during deliberations would not have been sustained because the jury was instructed not to turn the cell phone on. Because Hopwood fails to show that an objection would have been sustained, his counsel was not deficient, and we hold that Hopwood's ineffective assistance claims fail.

## VII.  RIGHT TO PRESENT A DEFENSE – RULE OF COMPLETENESS

Hopwood argues that under the rule of completeness, the trial court erred by denying his request to admit the remainder of GSW's statement made to Detective Faivre that she had worked with two other men related to her prostitution services.  We decline to consider this claim because Hopwood fails to cite to the record.

RAP 10.3(a)(5) requires a party to make include "[r]eference to the record . . . for each factual statement."  The purpose of this rule and related rules is to "enable the court and opposing counsel efficiently and expeditiously to review the accuracy of the factual statements made in the briefs and efficiently and expeditiously to review the relevant legal authority."  *Hurlbert v. Gordon*, 64 Wn. App. 386, 400, 824 P.2d 1238 (1992).  We are under no obligation to scour a lengthy record to locate the portions relevant to a litigant's argument.  *Cowiche Canyon Conservancy,* 118 Wn.2d at 819.

Because Hopwood fails to cite to the record, we decline to review his claim under RAP 10.3(a)(5).

## VIII.  PASSION AND PREJUDICE

Hopwood argues that the trial court erred by admitting Detective Larson's testimony related to the purpose of the Task Force because his testimony was designed to appeal to the jury's passion and prejudice, implying that the prosecutor committed misconduct by eliciting this testimony.  We disagree.

We review the trial court's admission of evidence alleged to arouse unfair passion and prejudice for an abuse of discretion. *Fisher*, 165 Wn.2d at 750. To prevail on his prosecutorial misconduct claim, Hopwood must demonstrate that in the context of the entire record and trial circumstances, the prosecutor's conduct was both improper and prejudicial. *State v. Thorgerson*, 172 Wn.2d 438, 442, 258 P.3d 43 (2011). To demonstrate prejudice, Hopwood must show a substantial likelihood that the improper conduct affected the verdict. *Thorgerson*, 172 Wn.2d at 442–43. A prosecutor has a duty to seek verdicts free from appeals to the jury's passions or prejudices. *State v. Perez-Mejia*, 134 Wn. App. 907, 915, 143 P.3d 838 (2006).

Hopwood argues that the following testimony was improper:

[The State]: What affect does it have on your operation that this is not only a juvenile, but an out-of-state juvenile who is a runaway and who's on Backpage?

[Detective Larson]: I don't know that it affects me in any way, but it makes it a priority type of situation to where it's something to where we want to attempt to contact her immediately and get her off of the streets and out of danger and see if indeed she's being exploited by someone.

Br. of Appellant at 26; VRP (Feb. 21, 2017) at 383.

Hopwood cites *State v. Belgarde*[12] and argues that this testimony suggested that the jury needed to make special efforts to protect GSW and support the police on the Task Force which is an appeal to the jury's passion and prejudice. Br. of App. at 26. However, *Belgarde* addressed closing arguments, not witness testimony, and thus, *Belgarde* does not control.

The exchange at issue followed a line of questioning, without objection, about the Task Force's process when conducting human trafficking investigations. *See* VRP (Feb. 21, 2017) at 381-83. Defense counsel objected at the point where the detective began to describe complications

---

[12] 110 Wn.2d 504, 507, 755 P.2d 172 (1988).

during investigations that cross state lines. VRP (Feb. 21, 2017) at 383. Throughout the exchange, the prosecutor did not mention or emphasize any aspect of human trafficking or the types of sexual acts that a juvenile runaway may be exposed to during human trafficking. *See* VRP (Feb. 21, 2017) at 381-83. Nor did the detective's testimony refer to supporting the police or mention the crimes that Hopwood was accused of committing. *See* VRP (Feb. 21, 2017) at 381-83.

The testimony was not designed to arouse the jury's passion and prejudice and the State did not commit prosecutorial misconduct by eliciting this testimony. Thus, we hold that the trial court did not error by admitting this testimony.

IX. CELL PHONE – JURY DELIBERATIONS

Hopwood argues that under *State v. Boggs*,[13] the trial court committed reversible error by allowing the jury to have his cell phone during deliberations. We disagree.

As discussed above, Hopwood's cell phone was properly admitted into evidence as Exhibit 23, and the trial court gave the jury a limiting instruction regarding its use during deliberations. Because the trial court did not err, Hopwood's claim fails.

---

[13] In *State v. Boggs*, our Supreme Court held that "it is reversible error for a trial court to allow physical objects not admitted in evidence to go to the jury room." 33 Wn.2d 921, 933, 207 P.2d 743 (1949), *overruled on other grounds by State v. Parr*, 93 Wn.2d 95, 606 P.2d 263 (1980)).

No. 50427-8-II

We hold that all of Hopwood's claims fail and affirm.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

SUTTON, J.

We concur:

WORSWICK, P.J.

MELNICK, J.